# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| PARK 80 HOTELS, LLC, PL HOTELS, LLC, MAYUR PATEL, JSK EXTON LLC, JAY Z. KUBER HOSPITALITY, INC., PARMATTMA CORPORATION and SYNERGY HOTELS, LLC, *individually and on behalf of all others similarly situated,* | : : : : : Case No. _____ : : : |
| *Plaintiffs,* | : **JURY TRIAL DEMANDED** : : |
| v. | : : |
| HOLIDAY HOSPITALITY FRANCHISING, LLC and SIX CONTINENTS HOTELS, INC. d/b/a INTERCONTINENTAL HOTELS GROUP, and IHG TECHNOLOGY SOLUTIONS, LLC, | : : : : : : |
| *Defendants.* | |

## CLASS ACTION COMPLAINT

Plaintiffs Park 80 Hotels, LLC ("Park 80"), PL Hotels, LLC ("PL Hotels"), Mayur Patel, JSK Exton LLC ("JSK Exton"), JAY Z. Kuber Hospitality, Inc. ("Kuber"), Synergy Hotel, LLC ("Synergy") and Parmattma Corporation ("Parmattma") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, allege upon personal knowledge of the facts respectively pertaining to their own actions, and upon information and belief as to all other

matters, by and through their undersigned counsel, hereby bring this Class Action Complaint against Holiday Hospitality Franchising, LLC, and Six Continents Hotels, Inc. d/b/a Intercontinental Hotels Group, and IHG Technology Solutions, LLC (collectively, "Defendants").

## INTRODUCTION



1.      Defendant Six Continents Hotels, Inc. ("SCH") is the world's largest hotel company by room count and does business under the name InterContinental Hotels Group ("IHG") (SCH and IHG may hereinafter be collectively referred to as "IHG").

2.      IHG operates approximately some 5,600 hotels across more than 17 brands.

3.     IHG takes an asset-light approach, owning, franchising and/or managing hotels for third parties, with Holiday Inn as its mainstay chain, under such brands as Holiday Inn, Holiday Inn Express, and Holiday Inn Resorts, each bearing the identification as "an IHG Hotel."

4.     IHG also owns, manages and/or franchises other hotel brands such as Crowne Plaza, InterContinental, Staybridge Suites, Candlewood Suites, Hotel Indigo, Regent, and Kimpton.

5.     IHG owns Defendant Holiday Hospitality Franchising, LLC ("HHF"), its affiliate which offers and sells Holiday Inn brand franchises including, but not limited to, Holiday Inn, Holiday Inn Express and Holiday Inn Resort.

6.     IHG Technology Solutions, LLC is an Affiliate of Holiday Hospitality Franchising, LLC and Six Continents Hotels, Inc., which operates and licenses systems designed to provide distinctive, high quality hotel service as part of the InterContinental Hotels Group.

7.     Plaintiffs are franchisees who own and operate one or more hotels that bear an HHF brand mark pursuant to a License Agreement.

8.     For the second time in recent years, Defendants have allowed a third-party actor to access their network and disrupt numerous functions, including, but not limited to, IHG Concerto, the online platform that guests use to reserve hotel

rooms at any of the approximately 3,500 IHG-branded properties throughout the United States.

9.      Although IHG has not been forthcoming about the details, on or about September 5, 2022, its technology systems were subject to "unauthorized activity," which meant that its booking channels, reservations and customer care call centers and the IHG Help Desk were inoperable and inaccessible (the "Data Breach").

10.     As a result, Plaintiffs and the class members lost significant revenue because guests were not able to make bookings online, access their IHG One Rewards account or contact Reservations & Customer Care.

11.     Although IHG has not publicly commented on whether customer data was impacted, independent reporting reveals that—in addition to the inoperability of the reservation system—certain consumer data has been comprised.

12.     The Data Breach was the inevitable result of IHG's inadequate data security measures and lackadaisical approach to network security.

13.     Despite the well-publicized and ever-growing threat of cyberattacks, particularly in the hospitality industry, IHG refused to implement certain best practices, failed to upgrade critical security systems, ignored warnings about the vulnerability of its computer network and disregarded and/or violated applicable industry standards.

14.     Plaintiffs and Class Members are truly at the mercy of IHG in that the License Agreement mandates that they have no choice but to use and to pay for IHG's reservation system ("IHG Concerto") and technology, but in the event of a data security incident that compromises the system and, in turn, makes it impossible for guests to book rooms on IHG Concerto (not to mention third party booking sites like expedia and booking.com), there is no recourse for them to obtain compensation.

15.     As a result of IHG's actions and inactions, Plaintiffs have incurred significant damages in the form of lost revenue from bookings, loss of consumer goodwill, additional (and unavoidable) use of employee time dealing with the fallout from the Data Breach, including working with guests on cancellations, re-bookings and related issues.

16.     Accordingly, Plaintiffs bring this class action lawsuit on behalf of themselves and all other similarly situated franchisees that have suffered—and continue to suffer—financial losses as a direct result of Defendants' conscious failure to take adequate and reasonable cybersecurity measures.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, Pub. L. No. 109-2 Stat. 4 ("CAFA"), which confers federal jurisdiction over class actions where, as here: (a) there are 100 or

more members in the proposed class; (b) some members of the proposed Class have a different citizenship from Defendants and (c) the claims of the proposed class members exceed the sum or value of five million dollars ($5,000,000) in aggregate. *See* 28 U.S.C. § 1332(d)(2) & (6). The minimal diversity requirements under CAFA are satisfied.

18.    This Court has personal jurisdiction over Defendants because Defendants and HHF's sole member are citizens of the State of Georgia.

19.    Pursuant to 28 U.S.C. § 1391, venue is proper within the United States District Court for the Northern District of Georgia because Defendants and HHF's sole member reside in this District.

## THE PARTIES

**A.    Representative Plaintiffs.**

20.    Plaintiff Park 80 operates an HHF franchise hotel, specifically a Holiday Inn Express Hotel located at 4284 Highway 51 in La Place, Louisiana 70068.

21.    Plaintiff PL Hotels operates an HHF franchise hotel, specifically a Staybridge Suites Hotel located at 1100 W Prien Lake Road in Lake Charles, Louisiana 70601.

22.     Plaintiff Mayur Patel operates an HHF franchise hotel, specifically a Holiday Inn Express Hotel located at the intersection of Highway 165 and Baywood Drive in Pineville, Louisiana 71360.

23.     Plaintiff JSK Exton LLC operates an HHF franchise hotel, specifically a Holiday Inn Express Hotel located at 120 N. Pottstown Pike in Exton, Pennsylvania 19341. JSK Exton, LLC's sole member is Rishi Goragandhi, a resident of New Jersey.

24.     Plaintiff JAY Z. Kuber Hospitality, Inc. operates an HHF franchise hotel, specifically a Holiday Inn Express & Suites Hotel located at 35 Aldine Bender Road in Houston, Texas 77060.

25.     Plaintiff Parmattma Corporation operates an HHF franchise hotel, specifically a Holiday Inn Express Hotel located at 640 Old Mexia Road in Fairfield, Texas 75840.

26.     Plaintiff Synergy Hotels, LLC operates an HHF franchise hotel, specifically a Holiday Inn Express Hotel located at 4870 Old Rathmell Court in Obetz, Ohio 43207.  Synergy Hotels, LLC's sole member is Abhijit S. Vasani, a resident of Ohio.

**B.     Defendants.**

27.     Defendant HHF is a Delaware-registered limited liability company with its principal place of business located at Three Ravinia Drive, Suite 100 in Atlanta, Georgia 30346.  Defendant HHF is a citizen of Georgia.

28.     The sole member of Defendant HHF is Six Continents Hotels, Inc., which is a Delaware corporation with its principal place of business at Three Ravinia Drive, Suite 100, in Atlanta, Georgia 30346.  Member Six Continents Hotels, Inc. is a citizen of Georgia.

29.     Defendant IHG is a Delaware-registered corporation with its principal place of business is Three Ravinia Drive, Suite 100 in Atlanta, Georgia 30346.  Defendant IHG is a citizen of Georgia.

30.     Defendant IHG Technology Solutions LLC ("IHG Tech") is a New Hampshire-registered limited liability company with its principal place of business located at Three Ravinia Drive, Suite 100 in Atlanta, Georgia 30346.  Defendant IHG Tech is a citizen of Georgia.

31.     The sole member of IHG Tech is Six Continents Hotels, Inc. (which is a Delaware corporation with its principal place of business at Three Ravinia Drive, Suite 100, in Atlanta, Georgia 30346.  Member Six Continents Hotels, Inc. is a citizen of Georgia.

## COMMON FACTUAL ALLEGATIONS

**A.      The Parties' Relationship.**

32.     IHG has been in operation since 2003.

33.     Throughout its history, IHG has created and acquired hotel brands, including, but not limited to, Holiday Inn, Holiday Inn Express, Holiday Inn Resort (collectively, the "Holiday Inn brands"), Crowne Plaza, InterContinental, Staybridge Suites, Candlewood Suites, Hotel Indigo, Regent and Kimpton, among others.[1]

34.     IHG's franchising affiliate, HHF, licenses the right to use the Holiday Inn brands' marks to franchisees, including Plaintiffs, by entering into franchise agreements with them, which in many cases are referred to as "License Agreements."

35.     Plaintiffs are HHF franchisees pursuant to various license agreements with HHF, as shown in the following table:

| Franchisee | Date of Commencement | Type of Hotel | Hotel ID # |
|---|---|---|---|
| Mayur Patel | January 17, 2013 | Holiday Inn Express | 16462 |
| JSK Exton LLC | June 28, 2017 | Holiday Inn Express | 2069 |
| JAY Z. Kuber Hospitality, | November 11, 2014 | Holiday Inn Express & Suites | 14716 |

1       https://www.ihg.com/content/us/en/about/brands (last accessed Sept. 12, 2022).

| | | | |
|---|---|---|---|
| Inc. | | | |
| Park 80 Hotels, LLC | February 25, 2014 | Holiday Inn Express | 17137 |
| PL Hotels, LLC | October 30, 2014 | Staybridge Suites | 17547 |
| Synergy Hotels, LLC | September 2, 2015 | Holiday Inn Express Hotel | 18094 |
| Parmattma Corporation | November 17, 2016 | Holiday Inn Express Hotel | 6620 |

36.    By virtue of its ownership of HHF, IHG is an intended third-party beneficiary of the License Agreements

37.    In conjunction with the License Agreements, Defendants provide Plaintiffs and Class Members with a Franchise Disclosure Document ("FDD") that explain the franchise agreements and contractual requirements that govern the parties' relationships.

38.    Schedule 2 of the FDDs provided and entered contemporaneously with the License Agreements identify the following "Core Services":

39.    IHG Concerto is an IHG-proprietary, cloud-based computerized solution that provides key features needed to manage and operate a Hotel, including:

  • Reservations system;

  • Revenue management system;

• Content management system;

• Guest relations; and

• Hotel operations insights.

40.     As part of the Core Services, IHG Technology Solutions, LLC ("IHG Tech") provides network connectivity, system integration, and system interfaces between the Hotel, IHG Concerto, and other services comprising the IHG/Hotel ecosystem.

41.     **Support Services.** Support services include remote support and on-site maintenance for approved Hardware and Software specified in the Minimum Configuration and required as part of Franchisee's use of the Core Services and the Additional Required Services.

42.     **Hotel Opening Consultation Services** (required only for Hotels new to an IHG Portfolio Brand). Guidance and consulting on technology-related requirements for opening and operating an IHG Portfolio Brand Hotel, including use of property management system

43.     The FDD's Schedule 3 provides "Additional Required Services" and requires Plaintiffs and Class Members to enter agreements with Defendants allowing Defendants to provide specific data security to systems used by franchisees:

44.     **Property Management System.** The property management system ("PMS") is a comprehensive Software application used to coordinate the Hotel operational functions, e.g., front office, sales and planning, accounting, and

reporting. The PMS may be integrated or interface with the Core Services or other solutions, including reservations systems, revenue management systems, guest in-room entertainment, housekeeping optimization, and payment card authorization.

45.     **Secure Payment Solution.** Secure Payment Solution ("SPS") is a computerized payment card processing program. It contains a data security process designed to remove certain credit card information from IT systems administered by IHG Tech or its Affiliates. Using PCI-certified payment terminals, credit card data is encrypted and converted to tokens before entering the PMS. Participation Agreements for tokenization services and for installation services are required. In addition, Franchisee will be required to enter into a merchant processing application and agreement with the IHG Tech-approved merchant service provider.

46.     **Deployment, Installation, and Support.** A Service Provider will provide deployment, integration, and other support services for the Hotel PMS and SPS. A joinder or similar agreement is required in order to obtain these PMS/SPS Hardware, Software, and deployment services

47.     SCH owns or licenses and administers a computerized reservation network, the "Reservation System," revenue management system, and a cloud-based network. Components of the Reservation System, revenue management system, and cloud-based network operate under the name of IHG Concerto™ ("IHG Concerto™"). All hotels must be linked to the aforementioned central Reservation

System, including all system enhancements and upgrades such as the revenue management system ("RMS", which is fully integrated with IHG Concerto™).

48.     The Reservation System is maintained and secured by IHG Tech. Plaintiffs and Class Members are required to enter into Master Technology Services Agreements with IGH Tech.  IHG Tech invoices Plaintiffs and Class Members for Core Services and Additional Required Services.

49.     Plaintiffs and Class Members are also required to pay Defendants monthly fees for Concerto.

50.     Only Defendant's approved Hardware and/or Software may be installed on the IHG Tech infrastructure.  The Hotel's operations network is separate and apart from IHG Tech's infrastructure.  IHG Concerto and Core Services are located on IHG Tech's infrastructure.

51.     The "unauthorized activity" (*i.e.,* the Data Breach) occurred on Concerto which is owned, operated and maintained by Defendants.

**B.    IHG Franchise Disclosure Document Mandates Franchisees Pay Initial & Monthly Fees for Use of IHG Concerto, the Online Reservation Platform.**

52.     As set forth in the Franchise Disclosure Document ("FDD") for HHF, "SCH owns or licenses (in the case of certain software) and administers a computerized reservation network, the Reservation System, revenue management

system, and a cloud-based network."  (FDD at 4, a copy of the FDD is attached hereto as Exhibit A.)

53.    Components of the Reservation System, revenue management system, and cloud-based network operate under the name of IHG Concerto.  (*Id.*)

54.    According to IHG, IHG Concerto "is a technology platform designed to enable many capabilities, such as reservations, rate management, inventory management and yielding and interactive homepage." (*Id.* at 5.)  The IHG Concerto platform is also designed to support effective management of Hotel Content and quick response to Guest Relations issues." (*Id.*)

55.    As mandated by IHG, all of its hotels must be linked to the central Reservation System, including all system enhancements and upgrades such as the revenue management system ("RMS") or such successor systems as SCH may designate.

56.    Each franchisee is required to enter into the Master Technology Services Agreement ("MTSA" with IHG Technology Solutions LLC in order to access and communicate with the Reservation System. (The template MTSA is available at page 201 of the FDD.)

57.    Franchisees are required to enter into the "MTSA" with IHG Technology Solutions LLC in order to access and communicate with the Reservation System; an Opera license or hosting agreement (which are available upon request)

with Oracle for the software, installation, training, use and maintenance of the PMS software; and a contract with AT&T for the FastConnect Plus service.

58.     Franchisees pay significant Initial Fees to operate a franchise, including, but not limited to, for the Openings and Renovations program, which "provides services and training required to open a hotel in the System including IHG Concerto Ramp Up . . . ." (*Id.* at 27.)

59.     Other Fees that franchisees are required to pay are:

- Services Contribution - 3% of Gross Room Revenue for Holiday Inn brand group hotels, Holiday Inn resorts hotels and Holiday Inn Express brand group hotels

- Technology Services Fee[2] - $16.40 per room, per month[3]

- IHG Concerto, Yield & Price Optimization - costs between $30 and $120 per month may apply for competitive rate insight shopping.

- PMS Software Maintenance - costs vary according to technology needs.

---

[2]     The License Agreements define the Technology Fee as a "Fee charged to hotels for cost of operating and supporting Holidex System. This fee is generally calculated at a fixed $ amount per available room. In some cases, the fee may also be calculated based on specific % of Gross Room Revenue. This fee is generally increase by 2% each year effective January."

[3]     As set forth in Note 5, Holiday will use the Technology Services Fee to provide technology services, including IHG Concerto.  (Id. at 44.)  IHG mandates that "[y]our General Manager and front office staff must have access to IHG Concerto and complete necessary web-based training . . . ." (*Id.*)

(*Id*., Item 6, Fees, at 29.)[4]

60.     The License Agreements provides that "[f]or each month (or part of a month) during the License Term, Licensee will pay to Licensor by the 15th of the following month, except in the case of the Technology Fee in paragraph 3.B.(1)(c) below, which is payable monthly in advance:

> (a)     a royalty **of 6% of the Gross Rooms Revenue** attributable to or payable for rental of guest rooms at the Hotel (including, without limitation, any mandatory fee or surcharge charged to all or substantially all guests renting a room, including, but not limited to, resort fees), with no deduction for any item including, but not limited to, any adjustment for the cost of any food and beverage items provided or made available to a guest as an incident of a guest room rental, except for deductions for sales and room taxes only ("Gross Rooms Revenue");

> (b)     a "Services Contribution" equal to the percentage of Gross Rooms Revenue set forth in paragraph 15 below, to be used by Licensor for marketing, ***reservations***, and other related activities which, in Licensor's sole business judgment as to the long-term interests of the System, support marketing, reservations and other related functions. Costs that Licensee incurs in the acquisition, installation or maintenance of reservations services, equipment or training, or in its own marketing activities, do not constitute payment of the "Services Contribution". The Services Contribution is subject to change by Licensor from time to time if either approved by: {i) a

---

[4]     The Monthly Fees dictated by the FDD are in addition to the Estimated Initial Investments, which includes (for a 125-room, four-story holiday Inn/Holiday Inn & Suites Hotel) but is certainly not limited to, the cost of PMS Equipment; Software; Installation & Training; IHG Concerto Equipment; NGP/Payments Equipment; Software; Installation and Training (per Note 6) is between $83,000 and $96,000. (*Id*., FDD, Item 7 at 52.)

majority of members (which shall be counted on the basis of one hotel, one vote) of the System who represent a majority of the hotels to be subject to the increase; or (ii) approved by a majority of the members of the System or the "IHG Owners Association" (the franchisee association or successor sanctioned as such by Licensor) at a meeting of System licensees or at an annual IHG Owners Association meeting either as may be convened by Licensor upon no less than 45 days' advance notice. Licensor may, in its sole judgment, upon 30 days' prior notice, increase this Services Contribution by an amount not to exceed 1% of Gross Rooms Revenue and such increase shall be effective for a period no longer than 12 months; provided that, in the event of such increase, Licensor shall not make such a discretionary increase again for a period of 24 months after the expiration of any such increase;

(c)     a monthly Technology Fee of $13.80 for each guest room at the Hotel to be used by Licensor for provision of technology services, such as, but not limited to satellite communications services to the Hotel, plus such increases as Licensor may judge reasonable, but in no case exceeding in any calendar year 10% of the fee in effect at the beginning of that year (the Technology Fee does not include the cost, installation, maintenance or repair of any equipment at the Hotel);

(d)     all fees due for travel agent commission programs, including Electronic Commission Services and any Field Marketing Co-op programs attributable to the Hotel, and all fees due in connection with mandatory marketing, technology, guest loyalty and frequency, guest satisfaction, quality assurance, training, new hotel opening and other systems and programs established by Licensor, its parents, subsidiaries or its affiliated entities relating to the System; and

(e)     an amount equal to any sales, gross receipts or similar tax imposed on Licensor and calculated solely on payments

> required hereunder, unless the tax is an optional
> alternative to an income tax otherwise payable by
> Licensor.

61.    76. The Plaintiffs and Class Members have not received the benefit of

their bargain in that they have paid fees for services for, among many other things,

network security and access to IHG Concerto for them and prospective guests, which

obviously did not happen for a significant amount of time due to the Data Breach.

62.    If Plaintiffs had known Concerto would be compromised and hacked,

they would not have agreed to pay these monthly fees or certainly not in the amounts

they did.

**C.    The *Current* Data Security Incident.**

63.    On September 6, 2022, IHG publicly acknowledged that its network

was accessed by a third-party actor and that, as a result, its booking systems and

mobile applications were compromised and unavailable.[5]

64.    In a filing with the London Stock Exchange, titled "Unauthorised

access to technology systems," IHG reported that:

> parts of the Company's technology systems have been
> subject to unauthorised activity. IHG's booking channels

---

[5]    *See*  https://techcrunch.com/2022/09/07/ihg-hotels-outage-cyberattack/  (last
accessed Sept. 12, 2022).

and other applications have been significantly disrupted since yesterday, and this is ongoing.[6]

65.   IHG's brief statement included the usual self-serving verbiage that it "is working to fully restore all systems as soon as possible and to assess the nature, extent and impact of the incident."

66.   On September 6, 2022, IHG chief executive Keith Barr told franchise owners in an email that the company's technology systems had been "subject to unauthorized activity," which meant that IHG's booking channels, reservations and customer care call centers and the IHG Help Desk "have been significantly disrupted since 5 September."

67.   Mr. Barr's email continued that "[u]ntil this issue is addressed, guests will not be able to make bookings online, access their IHG One Rewards account, or contact the [Reservations & Customer Care]. However, hotels are currently able to take bookings and accept payments, except for initiating or amending any bookings made using IHG One Rewards points."

68.   Additionally, as a result of the Data Breach, "IHG One Rewards members may be temporarily unable to use certain membership features while visiting our hotels."

---

[6]   Unauthorised access to technology systems - 15:45:02 06 Sep 2022 - IHG News article | London Stock Exchange (last accessed Sept. 12, 2022).

69.     On September 7, 2022, Mr. Barr later sent a second email to "Owners of IHG hotels globally" explaining that additional platforms have been impacted: "IHG's booking channels, its Reservations & Customer Care (RCC) call centres and internal systems, such as Merlin and the IHG Help Desk, have been disrupted."

70.     Neal Patel, Chairman of the Asian American Hotel Owners Association ("AAHOA") Chairman, sent the following notice to members about the Data Breach, noting that IHG had acknowledged responsibility for the data security incident:



71.     In addition to the fact that IHG's reservation system and mobile applications were down, prospective guests could not book IHG-branded rooms on third-party sites such as Expedia and Booking.com.[7]

72.     This means that the typical discounted rates that guests would expect to see on websites like Expedia or Booking.com were not available, only the officially listed rates that are higher.

73.     IHG did not explain to Plaintiffs and Class Members how it planned to "be supporting hotel owners and operators as part of our response to the ongoing service disruption."[8]

74.     Although IHG refused to  specify the type of incident involved, the attack "does look like it's ransomware, and IHG will likely be in negotiations with the attackers to try to restore access and get their systems back up and running."[9]

---

[7]     *See,  e.g.*,   https://nypost.com/2022/09/09/holiday-inn-bookings-tank-after-security-breach-franchisees/ (last accessed Sept. 12, 2022).

[8]     In keeping with its tight-lipped approach, a spokesperson for IHG said that there was no more information available about when the system might be expected to be operational again and declined to comment about the nature of the cyber-attack. *See*   https://www.nola.com/news/business/article_4380004e-2eda-11ed-b76c-bfed23864e77.html (last accessed Sept. 12, 2022).

[9]     https://www.spiceworks.com/it-security/security-general/news/intercontinental-hotels-group-cyberattack-ransomware/ (last accessed Sept. 12, 2022).

75.   Although IHG's statement did not say whether customer data was impacted, independent reporting reveals that—in addition to the inoperability of the reservation system—consumer data has been comprised.[10]

76.   In addition to lost bookings and revenue, Plaintiffs and the putative Class Members lost untold number of employee work hours because reservations that had been previously booked "had to be redone again at the property when the guest arrived."

**D.   The Previous IHG Data Breach in 2017.**

77.   This is not the first time that IHG's network and computer systems have been accessed or compromised.

78.   In December of 2016, IHG announced that it was made aware of a pattern of unauthorized charges occurring on payment cards that were used at a "small number of U.S.-based hotel locations," and began an investigation.

---

[10]   https://www.forbes.com/sites/suzannerowankelleher/2022/09/07/data-breach-ihg-hotel-booking-holiday-inn-kimpton/?sh=c2d7afd69fa1   (last accessed Sept. 12, 2022); https://www.spiceworks.com/it-security/security-general/news/intercontinental-hotels-group-cyberattack-ransomware/ (stating that "[a]ccording to the analysis by cyber forensics and intelligence company Hudson Rock, 4,053 ICH users and 15 of its 325,000 employees were compromised in the attack whose perpetrator remains unknown").

79.    Initially thought to have been a minor breach that affected a couple of its properties, the actual scope of the 2016 attack was much more extensive.[11]

80.    Turns out that incident resulted in a three-month long data breach wherein 1,175 IHG properties were infected with malware in order to steal customers' financial information.

81.    On February 3, 2017, IHG announced that the security breach affected 12 of its locations.

82.    In April of 2017, IHG expanded the number of affected locations to over 1,000 locations and finally issued a data breach notification letter to affected customers.

83.    In May of 2017, a class action lawsuit was filed against IHG by a class of consumers alleging that lax data security standards resulted in hackers accessing sensitive payment information including card numbers, expiration dates, verification codes and cardholder names for debit or credit cards used at the hotels. *See Orr v. InterContinental Hotels Group PLC*, Case No. 1:17-cv-01622-MLB (N.D. Ga.).[12]

---

[11]    https://www.spiceworks.com/it-security/security-general/news/intercontinental-hotels-group-cyberattack-ransomware/

[12]    Plaintiffs alleged that "IHG failed to take adequate steps to prevent the installation of malware on its payment system, failed to recognize existing vulnerabilities in its payment system, and failed to detect the Security Breach." And, that "[d]espite IHG's awareness of its data security obligations, IHG's treatment of Private Information entrusted to it by its customers fell far short of satisfying IHG's legal duties and obligations, and included violations of the PCI DSS. IHG failed to

84.     On September 2, 2020, a class settlement resolving that case was granted final approval by the court. *See* DE 2017-cv-01622.

**E.    Despite These Well-Known Risks, IHG's Lackadaisical Approach to Data Security Contributed to this Most Recent Data Breach.**

85.     IHG was clearly aware of the threat of a data breach given its prior data security incident only a few years ago, not to mention the numerous prior high-profile breaches that have occurred in the hospitality and other consumer-facing industries.

86.     IHG absolutely knew (and publicly acknowledged) that it and other hotel chains were prime targets for hackers given the significant amount of sensitive customer information it collects in the course of business.

87.     It is not surprising that hotels have been frequent targets for hackers. As noted by one cybersecurity expert, "hotels are an attractive target for hackers because they hold a lot of sensitive information, including credit card and passport details, but often don't have security standards as tough as those of more regulated industries, like banking."

---

ensure that access to its data systems was reasonably safeguarded, failed to acknowledge and act upon industry warnings and failed to use proper security systems to detect and deter the type of attack that occurred and is at issue here."

88.    The number of data breaches occurring in the hospitality sector is long,

but not particularly distinguished:

- in October 2018, Radisson Hotels disclosed a data breach affecting Radisson Rewards members who had their names, company names, e-mail addresses, addresses, phone numbers, Radisson Rewards member numbers and frequent flyer numbers accessed by an unauthorized party;

- In August 2018, China-based Huazhu Hotels Group announced a massive data breach where the personal information of hundreds of millions of hotel guests was exfiltrated and offered for sale on the dark web;

- In November 2017, Hilton Worldwide Holdings Inc. agreed to pay $700,000 and bolster its data security practices for mishandling data breaches in 2014 and 2015, including failing to maintain reasonable data security and failing to notify victims of the data breach in a timely manner.

- In October 2017, Hyatt announced that it discovered unauthorized access to payment card information at 41 of its properties worldwide. This announcement came on the heels of Hyatt's announcement in late 2015 that hackers had gained access to credit card systems at 250 properties in 50 different countries for a period spanning nearly four months, exposing customers' payment card data including cardholder names, numbers, expiration dates, and internal verification codes.

- In July 2017, multiple hotel chains including Hard Rock Hotels & Casinos, Four Seasons Hotels and Resorts, Trump Hotels, Loews Hotels, Kimpton Hotels & Restaurants, RLH Corporation, and Club Quarter Hotels, among others, reported a data breach via a third-party reservations system provided by Sabre Hospitality Solutions. The breach permitted unauthorized access to customers' credit card information and certain reservation information between August 2016 and March 2017.

- In September 2016, Kimpton Hotel & Restaurant Group LLC announced that customers' payment card information was compromised by malware installed on its servers at more than 60 of its hotels and restaurants during a six-month period.

- In June 2016, Hard Rock Hotel & Casino Las Vegas announced that after receiving reports of fraudulent activity associated with payment cards used at its hotel, the resort conducted an investigation revealing that malware had been installed on its servers allowing unauthorized access to customers' names, credit card numbers, expiration dates, and verification numbers.

- In November 2015, Noble House Hotels and Resorts announced a breach affecting six of its properties over different periods of time from December 29, 2014 to August 11, 2015. This breach also involved malware installed on Noble's POS systems.

- In March 2015, hotel chain Mandarin Oriental Hotel Group confirmed that its hotels were affected by a payment card breach indicating that some of the chain's POS systems were infected with malware capable of stealing customer card data.[13]

89.     Despite these well-publicized breaches, IHG failed to undertake adequate analyses and testing of its own systems to ensure that similar vulnerabilities were remedied.[14]

90.     That is, despite being holders of Personal Information for millions of individuals worldwide and providing the sole platform to Plaintiffs and Class

---

[13]     *See also*     https://www.upscalelivingmag.com/5-recent-luxury-hotel-data-breaches-you-should-know-about/

[14]     In addition to data breaches affecting the hospitality industry, IHG observed numerous, well-publicized data breaches involving other types of major corporations who were also targeted given the sensitive consumer information they retained.

Members on which reservations could be made, Defendants failed to prioritize data security by failing to adop reasonable data security measures that would prevent and detect unauthorized access to their highly-sensitive databases.

91.     Defendants had the resources to prevent a breach and made significant expenditures to market their hotels and hospitality services, but neglected to adequately invest in data security, despite the growing number of well-publicized data breaches affecting the hospitality and similar industries.

92.     But this Court need not impute knowledge to IHG based on these well-publicized incidences, IHG has publicly acknowledged that "[d]ynamic and external attacks against the hospitality industry have continued in 2021, with ransomware attacks in particular trending against technology providers, national infrastructure and supply chain. This has the potential to impact both IHG and our third-party providers."[15]

**F.    IHG's Public Statements Demonstrate that it was Aware of the Need to Enhance its Data Security Measures.**

93.     IHG, through its various public statements, has not been shy to acknowledge the risks posed by the current cyber-security landscape and at least give lip service to its efforts to meet those risks.

---

[15]  https://www.ihgplc.com/en/-/media/FBC3B4884AB449A4975A4302F38F1F7D.ashx
p. 46

94.    For instance, in its 2019 annual report, IHG stated that "we want everyone, including guests booking via our reservation channels, members of our loyalty programmes, colleagues, shareholders and other stakeholders, **to trust the way we manage their information and are addressing cybersecurity threats. We have standards, policies and procedures in place to manage how personal data should be used and protected.**" (emphasis added).

95.    IHG went on to note that "[i]nherent threats to cybersecurity and information governance remain significant and dynamic. **We are aware of our responsibilities in relation to a range of high-value assets (critical systems & guest, employee and other sensitive data) which may be targeted by various threat 'actors'** (including organised criminals, third parties and 'threat actor-employees'), and rapid evolution in societal, regulatory and media scrutiny of privacy arrangements mean that the potential impact of data loss to IHG financially, reputationally or operationally remains a dynamic risk factor."

96.    Tellingly, IHG noted that "[c]yber breaches increasingly appear to be an unfortunate reality for most firms and **we therefore invest in trying to avoid them where reasonable and practical to do so** – in recognition of the possible impact of cybersecurity breaches beyond data loss on operational performance and regulatory actions or fines, as well as the potential impact on our reputation. The threats towards the hospitality industry and the Group's information are dynamic,

and include cyber-attacks, fraudulent use, loss or misuse by employees and breaches of our vendors' security arrangements, amongst others."

97.    IHG has acknowledged the importance that its technology, particularly its online reservation system (Concerto) holds for franchisees: "[f]or owners, our offer is as much about our ability to create revenue advantages through data and technology, as it is about our scale and expertise. We understand this and are investing in the technology, tools and solutions that make the biggest difference to our guests, owners and teams."

98.    Moreover, IHG has recognized the significant damage that such an incident can have on hotel owners: "[a] s finances remain at a premium for hotel owners, our Information Security and Technology teams continue to collaborate to provide reliable, scalable and cost-effective solutions, targeted at areas of greatest opportunity for future attacks."

**G.    IHG's Data Breach Harmed Plaintiffs and the Class**

99.    As a result of IHG's most recent data security failings, Plaintiffs and the putative Class Members have suffered direct, compensable damages.

100.   First, the bookings at Plaintiffs' and Class Members' hotels are significantly decreased as a result of the Data Breach. Simply put, due to the Data Breach, the Hotels lost revenue as prospective guests could not book their reservations.

101.   If the IHG Concerto reservation platform were not compromised as a result of Defendants' actions and inactions as detailed herein, the reservations for occupancy for the days affected would be significantly higher, particularly so since as a result of the COVID-19 pandemic, guests typically wait until the last minute to book hotels.

102.   IHG is also very silent about the nature and extent of this hack, but considering that the systems have now been down for at least four days, it must be quite invasive.[16]  Concerto is still down.

103.   Plaintiffs and the Class Members paid numerous fees to IHG for which they have not received their benefit of the bargain. They have paid various different fees to Defendants on rooms for which they were unable to make reservations and had they known Concerto would be hacked, they would not have agreed to pay higher monthly fees to Defendants. .

104.   Plaintiffs and Class Members are truly at the mercy of Defendants in that the License Agreement mandates that they have no choice but to use and to pay for IHG Concerto, Core Services and IHG Tech infrastructure but in the event of a data security incident that compromises the system and, in turn, makes it impossible for guests to book rooms on IHG Concerto (not to mention third party booking sites

---

[16]    https://loyaltylobby.com/2022/09/06/ihg-confirms-the-reason-for-prolonged-website-maintenance-hack/ (last accessed Sept. 12, 2022).

like expedia and booking.com), there is no recourse for them to obtain compensation.

105.   Plaintiffs and the Class Members are not receiving the contractually-promised customer service; IHG's internal systems are down, and IHG has done nothing to assist Plaintiffs and Class Members.  Instead, it has fallen on Plaintiffs and Class Members to staff hotels with man power to compensate for IHG Concerto being taken down.

106.   Plaintiffs and Class Members are required to use IHG's reservation platforms on which IHG has failed to implement adequate data security resulting in a cyberattack making these platforms unavailable to , Plaintiffs and Class Members and unfairly imposing upon Plaintiffs' and Class Members' customer service departments.

107.   As a result of the Data Breach, Plaintiffs and Class Members have suffered the loss of good will of their guests as they are understandably  upset with the outage and scared about their personal data leaks.

108.   , As a result of the cyberattack, the Plaintiffs and Class Members cannot access their internal systems to provide IHG One Rewards members their status and elite benefits.

109.   Defendants claimed that Booking.com was sending reservations via email, but that those reservations must be manually entered at the hotel.

110.   Plaintiffs and Class Members have lost additional revenue because canceled reservations cannot be reconciled.

111.   Plaintiffs and Class Members have incurred additional expense having to staff hotels with additional manpower to manually make reservations and resolve cancelled reservations.

112.   As a result of the cyberattack, Plaintiffs' and Class Members' staff and General Managers have experienced ongoing delays and frustrations having to  deal repeatedly with the same problems each shift every day as a result of the Data Breach.

113.   Plaintiffs and Class Members did not receive the benefit of their bargain with Defendants because they paid fees for the value of services (Concerto, Core Services and IHG Tech infrastructure) they expected, but did not receive.

## GEORGIA LAW SHOULD APPLY TO PLAINTIFFS AND THE CLASS AS A WHOLE

114.   The State of Georgia has a significant interest in regulating the conduct of businesses operating within its borders.

115.   That is to say, Georgia, which seeks to protect the rights and interests of Georgia and all residents and citizens of the United States against a company headquartered and doing business in Georgia, has a greater interest in the claims of Plaintiffs and the Class than any other state and is most intimately concerned with the claims and outcome of this litigation.

116.   The principal place of business and headquarters of Defendants, located at Three Ravinia Drive, Suite 100 in Atlanta, Georgia 30346, is the "nerve center" of their business activities – the place where its high-level officers direct, control, and coordinate Defendants' activities, including major policy, financial and legal decisions.

117.   Defendants' actions and corporate decisions surrounding the allegations made herein were made from and in Georgia.

118.   Defendants' breaches of duty to Plaintiffs and Class Members emanated from Georgia.

119.   Application of Georgia law to the Class with respect to Plaintiffs' and the Class' claims is neither arbitrary nor fundamentally unfair because Georgia has significant contacts and a significant aggregation of contacts that create a state interest in the claims of Plaintiffs and the Class.

120.   Moreover, the License Agreement states that it "shall be deemed made and entered into in the State of Georgia… Any and all disputes between the parties, whether sounding in contract, tort or otherwise, shall be governed and construed under, and in accordance with, the laws and decisions (except any conflicts of law provisions) of the State of Georgia." *See* License Agreement at § 14(B)(1).

121.   Under Georgia's choice of law principles, which are applicable to this action, the common law of Georgia applies to the nationwide common law claims

of all Class members.  In addition, given Georgia's significant interest in regulating the conduct of businesses operating within its borders, and that Georgia has the most significant relationship to Defendants, as they are headquartered in Georgia and their executives and officers are located and made decisions which led to the allegations of this litigation there, there is no conflict in applying Georgia law to non-resident consumers such as Plaintiffs and the Class.

## <u>CLASS ACTION ALLEGATIONS</u>

122.   Pursuant to Federal Rules of Civil Procedure 23(a) and (b), Plaintiffs bring this action on behalf of themselves and the Class of similarly situated persons and entities defined as:

> **All United States residents (including persons and business entities) that operate or have operated a Holiday Hospitality Franchising LLC hotel in the United States pursuant to a License Agreement from January 1, 2016 through the date of Class Certification.**

Excluded from the Class are the officers, directors and employees of Defendants and their respective legal representatives, heirs, successors and assigns.

123.   Plaintiffs reserve the right to, after conducting discovery, modify, expand or amend the above Class definitions or to seek certification of a class or subclasses defined differently than above before any court determines whether certification is appropriate.

## A.     Rule 23(a) Requirements.

124.   **Numerosity**:  Consistent with Rule 23(a)(1), members of the Class are so numerous and geographically dispersed that their individual joinder is impractical.  The precise identities, number and addresses of members of the Class are presently unknown to Plaintiffs but may and should be known with proper and full discovery of Defendants, third-parties and all relevant records and documents.

125.   Upon information and belief, members of the Class number in the thousands.  All members of the Class assert claims for violation of the law as set forth herein.

126.   **Existence of Common Questions of Fact and Law**:  Consistent with Fed. R. Civ. P. 23(a)(2) and with 23(b)(3)'s commonality and predominance requirements, this action involves common questions of law and fact which predominate over any questions affecting individual Class members.  There is a well-defined commonality and community of interest in the questions of fact and law affecting the members of the Class.

127.   Such common questions of law or fact include, *inter alia*:

- Whether IHG failed to use reasonable care and commercially reasonable methods to secure and safeguard IHG's Concerto Platform;

- Whether IHG properly implemented its purported security measures to protect Plaintiffs' and Class members' Private Information from unauthorized capture, dissemination, and misuse;

- Whether IHG took reasonable measures to determine the extent of the Security Breach after it first learned of same;

- Whether IHG's conduct constitutes breach of an implied contract;

- Whether IHG willfully, recklessly, or negligently failed to maintain and execute reasonable procedures designed to prevent unauthorized access to IHG Concerto and IHG Tech's Infrastructure;

- Whether IHG was negligent in failing to properly secure and protect IHG Concerto and IHG Tech's Infrastructure that Plaintiffs and Class Members are required to use at their Hotels;;

- Whether Plaintiffs and the Class Members are entitled to damages, injunctive relief, or other equitable relief, and the measure of such damages and relief.

- Whether Defendants knew or should have known that its data environment and cybersecurity measures created a risk of a data breach;

- Whether Defendants controlled and took responsibility for protecting IHG Concerto and IHG Tech's infrastructure upon which Plaintiffs and Class Members relied for making reservations;

- Whether Defendants' security measures were reasonable in light of the FTC data security recommendations, state laws and guidelines, industry standards, and common recommendations made by data security experts;

- Whether Defendants acted in bad faith by abrogating its responsibility to protect platforms they required Plaintiffs and Class Members use;

- Whether Defendants owed Plaintiffs and the Class a duty to implement reasonable security measures on IHG Concerto and IHG Tech's infrastructure so they would not fall prey to a cyber-attack;

- Whether Defendants' failure to implement reasonable data security measures allowed the breach of its reservation systems and infrastructure  to occur and caused Plaintiffs and Class Members to sustain damages as a result of decreased reservations;

- Whether reasonable security measures known and recommended by the data security community could have prevented the breach;

- Whether Plaintiffs and the Class were injured and suffered damages or other losses because of Defendants' failure to reasonably protect its reservation system and infrastructure;

- Whether Plaintiffs and Class Members were deprived of the benefit of the bargain by paying franchisee fees to Defendants they otherwise would not have paid had they known of Defendants' inadequate data security on their reservation platform and infrastructure;

- Whether Plaintiffs and the Class are entitled to relief; and

- Whether Plaintiff and Class members are entitled to an award of reasonable attorneys' fees, prejudgment interest, and costs of suit.

128. **Typicality**:  Consistent with Fed. R. Civ. P. 23(a)(3), Plaintiffs are typical members of the Class.  Plaintiffs' claims have a common origin and share common bases with the Class Members. They originate from Defendants' same Franchise Agreements and Franchise Disclosure Documents  and Defendants failure to implement adequate data security on its reservation platform and infrastructure that every Plaintiff and Class Member are required to use and for which they are required to pay franchise fees if brought and prosecuted individually, the claims of

each Class member would necessarily require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief.

129. **Adequacy**:  Consistent with Fed. R. Civ. P. 23(a)(4), Plaintiffs are adequate representatives of the Class because Plaintiffs are members of the Class and are committed to pursuing this matter against Defendants. Plaintiffs' interests do not conflict with the interests of the Members of the Class they seek to represent. Plaintiffs have retained competent counsel and intend to prosecute this action vigorously.  Plaintiffs' counsel will fairly and adequately protect the interests of the members of the Class.

**B.      Rule 23(b)(2) and (3) Requirements.**

130.  This lawsuit may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) because Plaintiffs and the Class seek declaratory and injunctive relief, and all of the above requirements of numerosity, common questions of fact and law, typicality, and adequacy are satisfied.  Moreover, Defendants have acted on grounds generally applicable to Plaintiffs and the Class as a whole, thereby making declaratory and/or injunctive relief proper and suitable remedies.

131.  This lawsuit may also be maintained as a class action under Federal Rule of Civil Procedure 23(b)(3) because questions of fact and law common to the Class predominate over the questions affecting only individual members of the

Class, and a class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by each individual Class Member may be disproportionate to the burden and expense of individual prosecution of complex and extensive litigation to proscribe Defendants' conduct and practices.

132. Additionally, effective redress for each and every Class Member against Defendants may be limited or even impossible where serial, duplicate, or concurrent litigation occurs arising from these disputes. Even if individual Class Members could afford or justify the prosecution of their separate claims, such an approach would compound judicial inefficiencies, and could lead to incongruous and conflicting judgments against Defendants.

## COUNT I

### Breach of Contract
### (Against HHF, SCH, IHG & IHG Tech)

133. Plaintiffs incorporate by reference paragraphs 1 - 131 as if set forth at length herein.

134. At all times relevant to this litigation, Defendant HHF possessed individual virtually identical contractual relationships with each Plaintiff and Class Member through the License Agreements.

135. By virtue of their ownership of HHF and control over the IHG Marketplace, IHG and SCH are intended third-party beneficiaries of the License Agreements.

136.    Additionally, the FDDs impose duties and obligations on Defendants.

137.    Franchisees are required to enter contracts with IHG Tech and to pay Defendants franchise fees for use of Defendants' reservation platform, IHG Concerto, Core Services and IHG Tech Infrastructure.

138.    Beyond the written terms of the License Agreement, Defendants owe a duty of good faith and fair dealing to Franchisees in relation to their performance under the License Agreement, FDDs and related agreements (collectively, "Agreements").

139.    Defendants breached their express and implied duties under the Agreements   by requiring Plaintiffs and Class Members to use IHG Concerto and IHG Tech Infrastructure to make reservations, collect franchise fees for these services, but failing to protect these platforms from a data breach resulting in lost revenue to Plaintiffs and Class Members, failing to perform remedial actions after the Data Breach occurred to get the IHG Concerto up and running so Plaintiffs and Class Members could resume making reservations, and failing to provide support to Plaintiffs and Class Members while Concerto was offline.

140.    As a direct and proximate result of Defendants' ongoing breaches of contract and their express and implied contractual duties, Plaintiffs have sustained actual losses and damages as described in detail above, including they did not get

the benefit of the bargain for which they paid. Plaintiffs and Class Members have

suffered monetary damages in an amount to be proven at trial.

## COUNT II

**Violations of Georgia Uniform Deceptive Trade Practices Act,
O.C.G.A. §§ 10-1-370 *et seq.*
(Against HHF, SCH,  IHG & IHG Tech)**

141.   Plaintiffs incorporate paragraphs 1 - 131 as if set forth at length herein.

142.   Plaintiffs and Class Members are "persons" within the meaning of

O.C.G.A. § 10-1-371(5) of the Georgia Uniform Deceptive Trade Practices Act

("Georgia UDTPA").

143.   Defendants engaged in deceptive trade practices in the conduct of their

business, in violation of Ga. Code § 10-1-372(a), including:

- Representing that goods or services have characteristics that they do not have;

- Representing that goods or services are of a particular standard, quality, or grade if they are of another;

- Advertising goods or services with intent not to sell them as advertised;

- Engaging in other conduct that creates a likelihood of confusion or misunderstanding.

144.   Defendants' deceptive trade practices include, *inter alia*:

a.   Implementing and maintaining cybersecurity and privacy measures that were knowingly insufficient which was a direct and proximate cause of the Data Breach;

b.  Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures to its Concerto platform and IHG Tech infrastructure despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c.  Failing to comply with common law and statutory duties pertaining to the security and privacy of individuals making reservations on the Concerto platform including duties imposed by the Federal Trade Commission Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach and

d.  Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure the Concerto platform and IHG Tech infrastructure.

145.  Defendants' omissions were material because they were likely to and did deceive Plaintiffs and Class Members about the adequacy of Defendants' data security on the Concerto platform and ability to protect the platform from a cyberattack.

146.  Had Defendants disclosed to Plaintiffs and Class Members that their cybersecurity on Concerto and IHG Tech infrastructure were not secure and, thus, vulnerable to attack, Defendants would have been unable to continue in business and would have been forced to adopt reasonable data security measures and comply with the law.

147.  Instead, Defendants required Plaintiffs and Class Members to use Concerto and IHG Tech infrastructure to make reservations for which Plaintiffs and Class Members paid significant franchisee fees. In collecting these fees, Defendants

omitted and concealed information from Plaintiffs and Class Members that Defendants' data security practices were knowingly insufficient to maintain the safety of their platforms, and (2) that Defendants were not compliant with basic data security requirements and best practices to prevent a Data Breach.

148.   As a direct and proximate result of IHG/HHF's actions, Plaintiffs and Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages.

149.   Plaintiffs and the Class Members seek all relief allowed by law, including injunctive relief and reasonable attorneys' fees and costs under Ga. Code § 10-1-373.

## COUNT III

### Negligence
### (Against Defendants)

150.   Plaintiffs incorporate paragraphs 1 - 131 as if set forth at length herein.

151.   Defendants owe numerous duties to Plaintiffs and the other Members of the Class. These duties include:

- exercising reasonable care in securing and safeguarding Concerto and IHG Tech infrastructure from a cyberattack;

- using reasonable and adequate security procedures that are compliant with the PCI-DSS standards and with industry-standard practices; and

- implementing processes to quickly detect a data breach and to timely act on warnings about data breaches, including promptly

notifying Plaintiffs and the other Members of the Class of the Security Breach.

152.   IHG knew or should have known the risks of collecting and storing Personal Identifiable Information on the Concerto platform and IHG Tech infrastructure, the target these would be to hackers and the impact to Plaintiffs and Class Members if these systems were taken down.  IHG knew of the many breaches that targeted other hotel chains in the months before the Data Breach.

153.   IHG breached the duties it owes to Plaintiffs and Class members in several ways, including:

- by failing to implement adequate security systems, protocols and practices sufficient to protect their Concerto platform and IHG Tech infrastructure from a cyberattack  and thereby creating a foreseeable risk of harm;

- by failing to comply with the minimum industry data security standards, including the PCI-DSS, during the period of the Data Breach; and

- by failing to timely and accurately disclose to Plaintiffs and Class Members the Data Breach and failing to implement a new reservation system or assist with delays, cancellations and customer care.

154.   But for IHG's wrongful and negligent breach of the duties it owed to Plaintiffs and the other Class Members, the Concerto platform and/or IHG Tech infrastructure would not have been hacked and taken off line.

155.   The injury and harm that Plaintiffs and the other Class members suffered was the direct and proximate result of Defendants' negligent conduct.

156.   As a direct and proximate result of Defendants' negligence, Plaintiffs and the Class Members have been injured as described herein and are entitled to damages in an amount to be proven at trial.  Plaintiffs and Class Members' injuries include, but are not limited to, the following:

    a.   Paying fees for Concerto, Core Services, and IHG Tech infrastructure they would not have otherwise paid for and/or paying more for these platforms than they otherwise would have paid, had they known the truth about Defendants' substandard data security practices;

    b.   Costs associated with having to pay additional employees to manually make reservations and reconcile canceled reservations;

    c.   Costs associated with revenue lost for decreased reservations that were not made at Plaintiffs' and Class Members' Hotels because Concerto was hacked;

    d.   Loss of good will with customers of Plaintiffs and Class Members because reservations could not be made and IHG One Rewards could not be accessed and

    e.   Costs associated with time spent and the loss of productivity from taking time to address and attempt to mitigate and address the consequences of the Data Breach at the Hotels.

## COUNT IV

### Negligence *Per Se*
### (Against Defendants)

157.   Plaintiffs incorporate paragraphs 1 - 131as if set forth herein.

158.   Defendants' unreasonable data security measures and failure to timely notify Plaintiffs and the Class of the Data Breach violates Section 5 of the FTC Act. Although the FTC Act does not create a private right of action, both require

businesses to institute reasonable data security measures and breach notification procedures, which Defendants failed to do.

159.   Section 5 of the FTCA, 15 U.S.C. §45, prohibits "unfair. . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like Defendants of failing to implement and use reasonable measures to protect platforms on which they collect Personal Identifiable Information.  The FTC publications and orders described above also form the basis of Defendants' duty.

160.   Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to secure Concerto and IHG Tech infrastructure which collects personally identifiable information and sensitive data and by not complying with applicable industry standards.  Defendants' conduct was particularly unreasonable given the sensitive nature and amount of data they stored and the foreseeable consequences of a Data Breach should Defendants fail to secure its systems.

161.   Defendants' violation of Section 5 of the FTC Act constitutes negligence per se.

162.   As a direct and proximate result of Defendants' negligence per se, Plaintiffs and the Class have suffered and continue to suffer injury.

## COUNT V

### Recovery of Expenses of Litigation O.C.G.A. § 13-6-11
### (Against HHF, SCH,  IHG & IHG Tech)

163.   Plaintiffs incorporate paragraphs 1 - 131 as if set forth at length herein.

164.   Pursuant to O.C.G.A. § 13-6-11, the jury may allow the expenses of litigation and attorneys' fees as part of the damages where a defendant "has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense."

165.   Defendants through their actions alleged and described herein acted in bad faith, were stubbornly litigious, or caused the Plaintiffs and the Class Members unnecessary trouble and expense with respect to the transaction or events underlying this litigation.

166.   The Plaintiffs and Class Members therefore request that their claim for recovery of expenses of litigation and attorneys' fees be submitted to the jury, and that the Court enter a Judgment awarding their expenses of litigation and attorneys' fees pursuant to O.C.G.A. § 13-6-11.

167.   Defendants through its actions alleged and described herein acted in bad faith, was stubbornly litigious, or caused Plaintiffs unnecessary trouble and expense with respect to the transaction or events underlying this litigation.

168.   As numerous data security experts and data security standards make clear, even bare minimum measures can protect stored data from a data breach.

Defendants, however, refused to do the bare minimum. And, to this day, it is unknown whether Concerto and the IHG Tech infrastructure are secure.

169.   As further described above, Plaintiffs and the Class have been injured and suffered losses directly attributable to the Data Breach.

170.   Plaintiffs therefore request that their claim for recovery of expenses of litigation and attorneys' fees be submitted to the jury, and that the Court enter a Judgment awarding their expenses of litigation and attorneys' fees pursuant to O.C.G.A. § 13-6-11.

## COUNT VI

### Declaratory and Injunctive Relief
### (Against HHF, SCH,  IHG & IHG Tech)

171.   Plaintiffs incorporate paragraphs 1 - 131 as if set forth at length herein.

172.   Under the Declaratory Judgment Act, 28 U.S.C. §§2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as those alleged herein, which are tortious, and which violate the terms of the federal and state statutes described above.

173.   An actual controversy has arisen in the wake of the Data Breach at issue regarding Defendant's common law and other duties to act reasonably with respect to safeguarding the data of Plaintiffs and the Class. Plaintiffs allege Defendants'

actions in this respect were inadequate and unreasonable and, upon information and belief, remain inadequate and unreasonable.

174. Additionally, Plaintiffs and the Class continue to suffer injury due to the continued and ongoing threat of additional fraud against them or on their accounts.

175. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

176. Defendants owed, and continues to owe a legal duty to secure the sensitive information with which it is entrusted, specifically including information it obtains from its customers, and to notify impacted individuals of the Data Breach under the common law, Section 5 of the FTC Act;

177. Defendants breached, and continues to breach, its legal duty by failing to employ reasonable measures to secure its customers' personal information; and,

178. Defendants' breach of its legal duty continues to cause harm to Plaintiffs and the Class.

179. The Court should also issue corresponding injunctive relief requiring Defendants to employ adequate security protocols consistent with industry standards to protect the Concerto Platform and IHG Tech Infrastructure.

180. If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another breach

of Defendants' data systems.  If another breach of Defendants' data systems occurs, Plaintiffs and the Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct.  Simply put, monetary damages, while warranted to compensate Plaintiffs and the Class for their out-of-pocket and other damages that are legally quantifiable and provable, do not cover the full extent of injuries suffered by Plaintiffs and the Class, which include monetary damages that are not legally quantifiable or provable.

181.   The hardship to Plaintiffs and the Class if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued.

182.   Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach, thus eliminating the injuries that would result to Plaintiffs, the Class, and the public at large.

## COUNT VII

### Unjust Enrichment (In the Alternative)
### (Against HHF, SCH,  IHG & IHG Tech)

183.   Plaintiffs incorporate paragraphs 1 - 131 as if set forth at length herein.

184.   Plaintiffs and the other Class Members conferred a monetary benefit on IHG. Specifically, Plaintiffs and the other Class members were required to use IHG

Concerto and IHG Tech Infrastructure for reservations at their Hotels. Plaintiffs and Class Members paid fees to Defendants to use these platforms for reservations at their Hotels.

185. In exchange, IHG should have protected Concerto and IHG Tech infrastructure from a cyberattack. Instead, these platforms had inadequate data security and were the subject of a cyberattack.

186. As a result, Plaintiffs and Class Members could not make reservations at their Hotels on Concerto.

187. Defendants knew that Plaintiffs and the other Class Members conferred a benefit on Defendants profited from Plaintiffs' and the other Class Members' use of Concerto to make reservations at their Hotels because Defendants required they use Concerto and collected fees from Plaintiffs and Class Members for using Concerto.

188. IHG failed to secure Concerto and IHG Tech infrastructure from the Data Breach. Defendants inequitably acquired fees from Plaintiffs and Class Members for the required use of Concerto, but they were unable to use Concerto to make reservations and lost revenue because of Defendants' inadequate data security.

189. Plaintiffs and the other Class members have no adequate remedy at law.

190. Under the circumstances, it would be unjust for Defendants to be permitted to retain fees paid by Plaintiffs and Class Members for the use of Concerto.

191.   Defendants should be compelled to disgorge into a common fund or constructive trust for the benefit of Plaintiffs and the other Class Members fees that it unjustly received from them. In the alternative, Defendants should be compelled to refund the amounts that Plaintiffs and the other Class members overpaid.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiffs Park 80 Hotels, LLC, PL Hotels, LLC, Mayur Patel, JSK Exton LLC, JAY Z. Kuber Hospitality, Inc., Synergy Hotels, LLC and Parmattma Corporation, individually and on behalf of the other members of the Class proposed herein, respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

A.   Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiffs Park 80 Hotels, LLC, PL Hotels, LLC, Mayur Patel, JSK Exton LLC, JAY Z. Kuber Hospitality, Inc.,  Parmattma Corporation, Synergy Hotels, LLC as Class Representatives, and appointing undersigned counsel as Lead Counsel for the Class;

B.   Ordering IHG to pay actual damages to Plaintiffs and the other members of the Class;

C.   Ordering Defendants be disgorged of fees:

D.   A declaratory judgment in favor of Plaintiffs and the Class;

E.    Injunctive relief to Plaintiffs and the Class;

F.   Ordering Defendants to pay attorneys' fees and litigation costs to Plaintiffs O.C.G.A. § 13-6-11 and

as otherwise allowed by law;

G.    Ordering Defendants to pay both pre- and post-judgment interest on any amounts awarded; and

H.    Ordering such other and further relief as may be just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury of all claims in this complaint so triable.

Dated: September 15, 2022                    Respectfully submitted,

*/s/ MaryBeth V. Gibson*
MaryBeth V. Gibson
Georgia Bar No. 725843
N. Nickolas Jackson
Georgia Bar No. 841433
**The Finley Firm, P.C.**
3535 Piedmont Road
Building 14, Suite 230
Atlanta, Georgia 30305
T: (404) 978-6971
F: (404) 320-9978
MGibson@TheFinleyFirm.com
Njackson@TheFinleyFirm.com

Andrew P. Bleiman (*pro hac vice forthcoming*)
Mark Fishbein (*pro hac vice forthcoming*
**Marks & Klein, LLP**
1363 Shermer Road, Suite 318
Northbrook, Illinois 60062
T: (312) 206-5162
F: (732) 219-0625
andrew@marksklein.com

mark@ marksklein.com

Justin M. Klein (*pro hac vice* forthcoming)
**Marks & Klein, LLP**
63 Riverside Avenue
Red Bank, New Jersey 07701
T: (732) 747-7100
F: (732) 219-0625
justin@marksklein.com

Justin E. Proper
Georgia Bar No. 141782
**WHITE AND WILLIAMS LLP**
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA 19103-7395
Phone: 215.864.7165
properj@whiteandwilliams.com

*Attorneys for Plaintiffs Park 80 Hotels, LLC, PL Hotels, LLC, Mayur Patel, JSK Exton LLC, JAY Z. Kuber Hospitality, Inc., Parmattma Corporation, and Synergy Hotels, LLC & the Putative Class*

<u>**CERTIFICATE OF COMPLIANCE**</u>

I certify that the foregoing pleading has been prepared with Times New Roman, 14-point font, in compliance with L.R. 5.1B.

*/s/ MaryBeth V. Gibson*
MARYBETH V. GIBSON