## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| PARK 80 HOTELS, LLC, PL HOTELS, LLC, MAYUR PATEL, INC., JSK EXTON LLC, JAY Z. KUBER HOSPITALITY, INC., PARMATTMA CORPORATION, SYNERGY HOTELS, LLC and PH LODGING TOMBALL, LLC, *individually & on behalf of all others similarly situated,* | : <br> : <br> : <br> : <br> : Case No. 1:22-cv-03709-LMM <br> : <br> : <br> : <br> : |
| *Plaintiffs,* | : <br> : **<u>JURY TRIAL DEMANDED</u>** |
| v. | : <br> : |
| HOLIDAY HOSPITALITY FRANCHISING, LLC and SIX CONTINENTS HOTELS, INC. d/b/a INTERCONTINENTAL HOTELS GROUP and IHG TECHNOLOGY SOLUTIONS, LLC, | : <br> : <br> : <br> : <br> : <br> : <br> : |
| *Defendants.* | : <br> : <br> : <br> : |

## <u>PLAINTIFFS' SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT[1]</u>

Plaintiffs Park 80 Hotels, LLC, PL Hotels, LLC, Mayur Patel, Inc., JSK Exton

LLC, JAY Z. Kuber Hospitality, Inc., Synergy Hotel, LLC, Parmattma Corporation

---

[1] Plaintiffs file this Second Amended Consolidated Class Action Complaint in compliance with this Court's February 8, 2024 Order. *See* [ECF 41].

and PH Lodging Tomball, LLC, individually and on behalf of all others similarly situated, hereby bring this class action lawsuit for damages and injunctive relief against Holiday Hospitality Franchising, LLC, Six Continents Hotels, Inc. d/b/a Intercontinental Hotels Group and IHG Technology Solutions, LLC and allege, upon personal knowledge of the facts pertaining to their own actions and upon due investigation, information and good faith belief as to all other matters, as follows:

## INTRODUCTION

1.     Defendant Six Continents Hotels, Inc. ("SCH") operates hotels and motels worldwide and is one of the world's largest hotel companies by room count, with 888,000 rooms globally. SCH's parent organization is InterContinental Hotels Group ("IHG") (hereinafter SCH and IHG may be collectively referred to as "IHG").

2.     Defendant Holiday Hospitality Franchising, LLC ("HHF") is IHG's franchising affiliate. Defendant Six Continents Hotel, Inc. is the sole managing member of HHF. SCH and IHG are the direct beneficiaries of the License Agreements that HHF enters with Plaintiffs and Class Members.

3.     Defendant IHG Technology Solutions, LLC ("IHG Tech") is an affiliate of Defendants HHF and SCH. Defendant Six Continents Hotels, Inc. ("SCH") is the sole member of IHG Tech. IHG Tech provides network connectivity, system integration and system interfaces, including IHG's Reservation Platform, "IHG Concerto," (collectively "Core Services") to Plaintiffs and Class Members

2

who are required to enter contracts with IHG Tech for these services. SCH and IHG are the direct beneficiaries of contracts IHG Tech enters with Plaintiffs and Class Members.

4.     IHG operates approximately 6,000 hotels across 19 hotel brands including such brands as Holiday Inn, Holiday Inn Express and Holiday Inn Resorts, each bearing the identification as "an IHG Hotel."

5.     For the second time in recent years, a third-party actor accessed IHG's network and disrupted numerous core functions including, but not limited to, IHG Concerto—the online platform that guests use to reserve hotel rooms at any of the approximately 3,900 IHG-branded properties throughout the United States.

6.     Specifically, on September 5, 2022, IHG's technology systems were, according to it, subject to "unauthorized activity," which meant that its booking channels, reservations and customer care call centers were rendered inoperable by an extremely rudimentary third-party attack. As a result, IHG Concerto and many of the Core Services for which Plaintiffs and Class Members—domestic IHG franchisees who own and operate one or more hotels that bear a Holiday Hospitality Franchising, LLC-brand mark— are required to use and pay significant fees to use.

7.     IHG's current Data Breach in which a third party—believed to be a hacker couple from Vietnam calling itself TeaPea—gained access to its network using an incredibly simplistic hacking technique known as a phishing attack

whereby the hackers accessed IHG's internal network via a downloaded of a malicious email attachment.

8.     IHG's data security practices were so inadequate that it did not detect the malicious email attachment and had not adequately trained its employees on how to respond to such attacks.

9.     Once it hacked IHG's network, TeaPea took down a significant number of IHG's networks and platforms—including IHG Concerto—after easily finding login details for IHG's internal password vault, which was available to over 200,000 employees.

10.     Access to the vault was secured by the most basic of passwords, "Qwerty1234," which is one of the most commonly used passwords worldwide. Given such a frequently used (and therefore readily knowable) password, it was foreseeable and even inevitable that IHG's reservations systems would be hacked.

11.     Importantly, when IHG became aware that TeaPea was able to access its network using the "QWERTY1234" password, IHG publicly admitted that the system was down because of "unauthorized activity":

> InterContinental Hotels Group PLC (IHG or the Company) reports that *parts of the Company's technology systems have been subject to unauthorized activity*. *IHG's booking channels and other applications have been significantly disrupted since yesterday, and this is ongoing*. … IHG is working to fully restore all

4

systems as soon as possible and to assess the nature, extent and impact of the incident.…[2]

12.    Not until September 29, 2022—over three weeks after the Data Breach—did IHG inform franchisees then that the booking websites and mobile application (and most other booking channels) were operational again.

13.    The Data Breach was the direct result of IHG's inadequate data security measures and lackadaisical approach to network security.

14.    The ever-growing threat of cyberattacks—particularly in the hospitality industry—is well-known.[3] Yet, despite this knowledge, IHG failed to implement certain best practices, failed to upgrade critical security systems, ignored warnings about the vulnerability of its computer network and disregarded and/or violated applicable industry standards.

---

[2]    *Unauthorised access to technology systems*, Sept. 6, 2022, https://www.ihgplc.com/en/news-and-media/news-releases/2022/unauthorised-access-to-technology-systems (last accessed Feb. 25, 2024) (emphasis added).

[3] As detailed, *infra,* there have been numerous well-publicized breaches in the hospitality industry not to mention the fact IHG's CEO (and public filings) have made numerous public statements about the importance IHG supposedly places on data security and privacy. *See, e.g.*, https://www.ihg.com/content/holidayinnclubvacations/hotels/en_US/brand/customer-care/privacy-statement.html ("The privacy and security of your personal information is very important to us.") (last accessed Feb. 25, 2024).

5

15.    The breach was entirely foreseeable and preventable as it utilized a common, well-known password that was available to 200,000 IHG employees,[4] IHG had a similar data breach a few years earlier and it had knowledge of dozens of high-profile data security incidents affecting hospitality industry and other companies.[5]

16.    Thus, as a result of IHG's dereliction of its data security obligations, its booking and reservations channel IHG Concerto, customer care call centers and the IHG Help Desk were all rendered inoperable by the Data Breach and inaccessible and unusable by Plaintiffs, Class Members and their customers from approximately September 5, 2022 through and including September 29, 2022.

17.    Those failings by IHG resulted in significant damages. First, Plaintiffs and Class Members suffered significant lost revenue due to missed bookings for basically the entire month of September 2022. Notably, prospective guests were not able to make bookings online—both directly through IHG Concerto ***and*** via third-party websites like Expedia and Booking.com (nor were they able to access their IHG One Rewards account or contact Reservations & Customer Care).

---

[4]      https://techhq.com/2022/09/holiday-inn-cyberattack-teaches-cybersecurity-lessons/#:~:text=Secondly%2C%20the%20hackers%20said%20the,potential%20access%20points%20for%20hackers (last accessed Feb. 29, 2024).

[5] IHG was unquestionably aware of the foreseeability that a data security incident could impact its network and core functions as it experienced a previous data privacy incident in 2016, resulting in a class action settlement. *See Orr v. Intercontinental Hotels Group PLC, et al.*, Case No. 1:17-cv-01622 (N.D. Ga).

18.     Moreover, Plaintiffs and Class Members did not receive the benefit of their bargain in that they pay numerous fees to IHG including, including but not limited to, a monthly technology services fee (currently $16.73 per room per month) for, among other things, network security and access to the Core Services, including IHG Concerto.

19.     Further, Plaintiffs and Class Members had to pay for considerable employee time dealing with the fallout from Defendants' data security failings including working with guests on cancellations, re-bookings and related issues. And Plaintiffs and Class Members incurred damages in the form of loss of consumer goodwill resulting in lower ratings for which IHG penalizes operators monetarily.

20.     Plaintiffs therefore bring this class action lawsuit on behalf of themselves and all other similarly situated domestic IHG franchisees that have suffered damages as a direct result of IHG's conscious failure to take adequate and reasonable cybersecurity measures.

21.     Plaintiffs seeks to remedy these harms for themselves and a class of all others similarly situated for: (i) Breach of License Agreements against HHF; (ii) Breach of Master Technology Service Agreements against SCH & IHG Tech; (iii) Violations of Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. §§ 10-1-370, *et seq.* against all Defendants; (iv) Negligence against all Defendants; (v) Negligence *Per Se* against all Defendants; (vi) Recovery of Expenses of Litigation

O.C.G.A. § 13-6-11 against all Defendants; (vii) Declaratory and Injunctive Relief against all Defendants and (viii) Unjust Enrichment against all Defendants.

## JURISDICTION & VENUE

22.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, Pub. L. No. 109-2 Stat. 4 ("CAFA"), which confers federal jurisdiction over class actions where, as here: (a) there are 100 or more members in the proposed class; (b) some members of the proposed Class have a different citizenship from Defendants and (c) the claims of the proposed class members exceed the sum or value of five million dollars ($5,000,000) in aggregate.

23.    The minimal diversity requirements under CAFA are satisfied.

24.    This Court has personal jurisdiction over IHG, HHF and IHG Tech, as well as the sole members of HHF and IHG Tech (who is SCH) because they are all citizens of the State of Georgia.

25.    Further to 28 U.S.C. § 1391, venue is proper within the United States District Court for the Northern District of Georgia because IHG, HHF and IHG Tech and the sole member (SCH) of HHF and IHG Tech reside in this District.

## THE PARTIES

### A.    *The Representative Plaintiffs.*

26.    Plaintiff Park 80 Hotels, LLC ("Park 80") is a Louisiana Limited Liability Company with its principal place of business located at 4284 Highway 51

in La Place, Louisiana 70068. The Managing Member, Vimal Patel, and the other members of Park 80, Kishorbhai Patel, Jayesh Patel and Vadant Vesanji, all reside in the State of Louisiana.

27.    Plaintiff Park 80 operates an HHF franchise hotel, specifically a Holiday Inn Express Hotel located at 4284 Highway 51 in La Place, Louisiana 70068.

28.    In 2014, Kishorbhai Patel entered into a Franchise License Agreement with HHF and Park 80 became the licensee via a fully executed addendum dated November 9, 2016. Plaintiff Park 80 entered into a Master Technology Agreement with SCH in 2014. Upon information and belief, Plaintiff Park 80 subsequently entered into a Master Technology Service Agreement with IHG Tech in approximately 2020.

29.    Plaintiff Park 80 is a current franchisee and was a franchisee during the Data Breach.

30.    Plaintiff PL Hotels LLC ("PL Hotels") is a Louisiana Limited Liability Company with its principal place of business located at 4284 Highway 51 in La Place, Louisiana 70068. The Managing Member, Vimal Patel, and the other members of Park 80, Kishorbhai Patel, Jayesh Patel and Vadant Vesanji, all reside in the State of Louisiana.

9

31.    Plaintiff PL Hotels operates an HHF franchise hotel, specifically a Staybridge Suites Hotel located at 1100 W Prien Lake Road in Lake Charles, Louisiana 70601.

32.    In 2014, HHF entered into a Franchise License Agreement with PL Hotels. Plaintiff PL Hotels entered into a Master Technology Agreement with SCH in 2014. Upon information and belief, Plaintiff PL Hotels subsequently entered into a Master Technology Service Agreement with IHG Tech in approximately 2020.

33.    Plaintiff PL Hotels is a current franchisee and was a franchisee during the Data Breach.

34.    Plaintiff Mayur Patel, Inc. ("Mayur Patel") is a corporation organized under the laws of the State of Louisiana with its principal place of business located at 4404 Parliament Court, #156 in Alexandria, Louisiana 71303.

35.    Plaintiff Mayur Patel operates an HHF franchise hotel, specifically a Holiday Inn Express Hotel located at the intersection of Highway 165 and Baywood Drive in Pineville, Louisiana 71360.

36.    In 2013, HHF entered into a Franchise License Agreement with Mayur Patel. In 2017, the Franchise License Agreement was amended to identify the Jaiambe of Pineville, LLC as the licensee.

37.    Plaintiff Mayur Patel entered into a Master Technology Agreement with SCH in 2013. Upon information and belief, Plaintiff Mayur Patel subsequently

entered into a Master Technology Service Agreement with IHG Tech in approximately 2020.

38.     Plaintiff Mayur Patel (also known as Jaiambe of Pineville, LLC) is a current franchisee and was a franchisee during the Data Breach.

39.     Plaintiff JSK Exton LLC ("JSK Exton") is a Pennsylvania Limited Liability Company with its principal place of business located at 120 N. Pottstown Pike, Exton PA 19341. JSK Exton's sole member is Rishi Goragandhi, a resident of New Jersey.

40.     Plaintiff JSK Exton operates an HHF franchise hotel, specifically a Holiday Inn Express Hotel located at 120 N. Pottstown Pike in Exton, Pennsylvania 19341.

41.     In 2017, HHF entered into a Franchise License Agreement with JSK Exton LLC. Plaintiff JSK Exton entered into a Master Technology Agreement with SCH in 2017. Upon information and belief, Plaintiff JSK Exton subsequently entered into a Master Technology Service Agreement with IHG Tech in approximately 2020.

42.     Plaintiff JSK Exton is a current franchisee and was a franchisee during the Data Breach.

43.     Plaintiff JAY Z. Kuber Hospitality, Inc. ("Kuber") is a corporation organized under the laws of the State of Texas with its principal place of business located at 8080 Main Street in Houston, Texas 77025-2808.

44.     Plaintiff Kuber operates an HHF franchise hotel, specifically a Holiday Inn Express & Suites Hotel located at 35 Aldine Bender Road in Houston, Texas 77060.

45.     In 2014, HHF entered into a Franchise License Agreement with Kuber. Plaintiff Kuber entered into a Master Technology Agreement with SCH in 2014. Upon information and belief, Plaintiff Kuber subsequently entered into a Master Technology Service Agreement with IHG Tech in approximately 2020.

46.     Plaintiff Kuber is a current franchisee and was a franchisee during the Data Breach.

47.     Plaintiff Parmattma Corporation ("Parmattma") is a corporation organized under the laws of the State of Texas with its principal place of business located at 640 Old Mexia Road in Fairfield, Texas 75840.

48.     Plaintiff Parmattma operates an HHF franchise hotel, specifically a Holiday Inn Express Hotel located at 640 Old Mexia Road in Fairfield, Texas 75840.

49.     In 2016, HHF entered into a Franchise License Agreement with Parmattma. Plaintiff Parmattma entered into a Master Technology Agreement with SCH in 2016. Upon information and belief, Plaintiff Parmattma subsequently

entered into a Master Technology Service Agreement with IHG Tech in approximately 2020.

50.    Plaintiff Parmattma is a current franchisee and was a franchisee during the Data Breach.

51.    Plaintiff Synergy Hotel, LLC ("Synergy") is an Ohio Limited Liability Company with its principal place of business located at 4870 Old Rathmell Court in Obetz, Ohio 43207. Synergy Hotels' sole member is Abhijit S. Vasani, a resident of Ohio.

52.    Plaintiff Synergy operates an HHF franchise hotel, specifically a Holiday Inn Express Hotel located at 4870 Old Rathmell Court in Obetz, Ohio 43207.

53.    In 2015, HHF entered into a Franchise License Agreement with Synergy. Plaintiff Synergy entered into a Master Technology Agreement with SCH in 2015. Upon information and belief, Plaintiff Synergy subsequently entered into a Master Technology Service Agreement with IHG Tech in approximately 2020.

54.    Plaintiff Synergy was a franchisee during the Data Breach.

55.    Plaintiff PH Lodging Tomball, LLC ("PH Lodging") is a Texas Limited Liability Company with its principal place of business located at 6111 Nikki Lane, Odessa, FL 33556. PH Lodging's sole owner is Satkar Hospitality, Inc., which is

incorporated in Illinois and maintains its principal place of business in Tomball, Texas.

56.    Plaintiff PH Lodging operates an HHF franchise hotel, specifically a Holiday Inn Express Hotel, located at 14055 Park Drive, Tomball, TX, 77377.

57.    In 2016, HHF entered into a Franchise License Agreement with PH Lodging. Plaintiff PH Lodging entered into a Master Technology Agreement with SCH in 2016. Upon information and belief, Plaintiff PH Lodging subsequently entered into a Master Technology Service Agreement with IHG Tech in approximately 2020.

58.    Plaintiff PH Lodging is a current franchisee and was a franchisee during the Data Breach.

**B.    *The Defendants.***

59.    Defendant HHF is a Delaware-registered limited liability company with its principal place of business located at Three Ravinia Drive, Suite 100 in Atlanta, Georgia 30346. Defendant HHF is a citizen of Georgia.

60.    The sole member of HHF is Six Continents Hotels, Inc., which is a Delaware corporation with its principal place of business at Three Ravinia Drive, Suite 100, in Atlanta, Georgia 30346. Member Six Continents Hotels, Inc. is a citizen of Georgia.

61.    Defendant InterContinental Hotels Group ("IHG" a/k/a IHG Hotels & Resorts for marketing purposes) is a Delaware-registered corporation with its principal place of business is Three Ravinia Drive, Suite 100 in Atlanta, Georgia 30346. Defendant IHG is a citizen of Georgia.

62.    Defendant IHG Tech is a New Hampshire-registered limited liability company with its principal place of business located at Three Ravinia Drive, Suite 100 in Atlanta, Georgia 30346. Defendant IHG Tech is a citizen of Georgia.

63.    The sole member of IHG Tech is Six Continents Hotels, Inc., which is a Delaware corporation with its principal place of business at Three Ravinia Drive, Suite 100, in Atlanta, Georgia 30346. Member Six Continents Hotels, Inc. is a citizen of Georgia.

## COMMON FACTUAL ALLEGATIONS

*A.    Background.*

64.    InterContinental Hotels Group was created after Six Continents split into two companies. IHG has been in operation as a standalone company since 2003.

65.    Throughout its history, IHG has created and acquired hotel brands including, but not limited to, Holiday Inn, Holiday Inn Express, Holiday Inn Resort (collectively, the "Holiday Inn brands"), Crowne Plaza, InterContinental, Staybridge Suites, Candlewood Suites, Hotel Indigo, Regent and Kimpton, among others.

66.     IHG's franchising affiliate, Defendant Holiday Hospitality Franchising, LLC licenses the right to use the Holiday Inn brands' marks to franchisees, including Plaintiffs. HHF enters into franchise agreements with franchisees (Plaintiffs), which in many cases are referred to as "License Agreements."

67.     Defendant HHF, through license agreements with Defendant Six Continents Hotels, Inc., offers and sells Holiday Inn brand licenses including, but not limited to, Holiday Inn, Holiday Inn Express and Holiday Inn Resort. HHF's direct corporate parent is SCH.

68.     Defendant SCH is the sole managing member of HHF, and as such is the direct beneficiary of the License Agreements HHF entered into with Plaintiffs and Class Members.

69.     IHG Technology Solutions, LLC ("IHG Tech") provides services related to the procurement, installation, training, use and maintenance of Property Management System ("PMS") equipment and software, including IHG Concerto. Defendant SCH is the sole managing member of IHG Tech, and as such is the direct beneficiary of the contracts IHG Tech entered into with Plaintiffs and Class Members. IHG Tech is also an affiliate of HHF and SCH.

70.     Plaintiffs are all IHG franchisees who own and operate one or more hotels in the United States that bear an HHF brand mark pursuant to various license agreements with HHF, as shown in the following table:

16

| Franchisee | Date of Commencement | Type of Hotel | Hotel ID # |
|---|---|---|---|
| Mayur Patel | January 17, 2013 | Holiday Inn Express | 16462 |
| JSK Exton LLC | June 28, 2017 | Holiday Inn Express | 2069 |
| JAY Z. Kuber Hospitality, Inc. | November 11, 2014 | Holiday Inn Express & Suites | 14716 |
| Park 80 Hotels, LLC | February 25, 2014 | Holiday Inn Express | 17137 |
| PL Hotels, LLC | October 30, 2014 | Staybridge Suites | 17547 |
| Synergy Hotels, LLC | September 2, 2015 | Holiday Inn Express Hotel | 18094 |
| Parmattma Corporation | November 17, 2016 | Holiday Inn Express Hotel | 6620 |
| PH Lodging Tomball, LLC | December 7, 2016 | Holiday Inn Express Hotel | 16619 |

## B. *The Parties' Contractual Relationship.*

71.    As part of the process of becoming an IHG franchisee, HHF provides prospective franchisees with a Franchise Disclosure Document ("FDD") that explains the franchise arrangement and contractual requirements that govern the parties' relationships.

72.    The FDDs are accompanied by agreements, such as the License Agreement and Master Technology Service Agreement, that Plaintiffs and Class Members must execute in connection with becoming a licensee in the IHG system.

73.    Plaintiffs were each provided a FDD that, summarized the provisions of the license agreement and attached additional agreements that the parties are

required to enter including the license agreement [ECF 18-1, p. 142] and the Master Technology Services Agreement ("MTSA") [ECF 18-1, p. 201].[6]

### 1. **The FDD**

74.    In the FDD, HHF notes that "SCH owns or licenses (in the case of certain software) and administers a computerized reservation network, the 'Reservation System,' and a cloud-based network. Components of the Reservation System and cloud-based network operate under various names, such as the HOLIDEX Plus system, PERFORM and IHG Concerto. All hotels must be linked to one of the aforementioned central Reservation Systems, including all system enhancements and upgrades [] or such successor systems as SCH may designate." FDD at 4.[7]

75.    HHF further states that "[t]he Reservation System will provide room availability and rate data on all hotels that Holiday franchises." *Id.* at 5 (stating that

---

[6] The FDDs and accompanying agreements including the License Agreements and MTAs are identical for each of the Plaintiffs and Class Members. The FDD and its attached license agreement and MTSA are found at ECF 18-1; *see also* https://www.franchisedirect.com/fdd/pdf/0000018d-e28c-df78-a1df-eeed00420000.

[7] As detailed *infra*, IHG Concerto is a technology platform designed to enable many capabilities such as reservations, digital check-in, stay enhancements, guest complaints, other front desk capabilities, rate management, inventory management and yielding and interactive homepage.

"IHG Concerto is a technology platform designed to enable reservations, rate management, inventory management and yielding").

76.    In the FDD, HHF notes that licensees will be required to pay to SCH a "Technology Fee" in the amount of $14.08 per room, per month, and that "Holiday will use the Technology Fee to provide technology services, including HOLIDEX Plus or IHG Concerto." *Id.*, Note 5.

77.    The FDD also requires that "Your General Manager and front office staff must have access to IHG Concerto." *Id.*

78.    The FDD further provides that after the opening of the Hotel, HHF will "(a) seek to maintain high standards of quality . . . to promote, protect and enhance the public image and reputation of the Holiday Inn, Holiday Inn Resort and Holiday Inn Express names, and to increase the demand for services offered by the System. . . (c) provide access to reservation services, if you are in compliance with your material obligations under the License." FDD at 74.

### 2.  **The License Agreement**

79.    HHF offers and grants licenses under the terms of a License Agreement (the "License"). *See* FDD at 1 & Ex. B thereto.

80.    As is relevant here, the License Agreement requires, in paragraph 3.B.(1)(c), licensees to pay "a monthly Technology Services Fee of $16.08 for each guest room at the Hotel **to be used by IHG for provision of technology services,**

**such as, but not limited to satellite communications services to the Hotel**, plus such increases as IHG may judge reasonable, but in no case exceeding in any calendar year 10% of the fee in effect at the beginning of that year (the Technology Services Fee does not include the cost, installation, maintenance or repair of any equipment at the Hotel)." *Id*. at B-4.

81.    And, in Section 4, entitled "IHG's RESPONSIBILITIES," HHF covenants that "[d]uring the License Term, so long as Licensee is in full compliance with its obligations hereunder, *IHG will afford Licensee access to reservation service for the Hotel on terms consistent with this License*." (emphasis added). *Id*. at B-5.

82.    Further, in that same Section 4, HHF states that IHG "will make available and use Services Contribution funds for various activities as may be computed on the basis generally applicable to licensees of the System." *Id*. at B-6.

### 3.  The Master Technology Services Agreement

83.    In addition to the license agreement, the FDD states that each Licensee "must enter into the Master Technology Services Agreement" with IHG Tech that provides for the procurement, installation, training, use and maintenance of PMS equipment and software "in order to access and communicate with the Reservation System." FDD at 4; *see also id.* at 80 (stating that "[i]n connection with the PMS

and IHG Concerto equipment and software, you must enter into the [MTSA] with IHG Tech").

84.    Plaintiffs and Class Members entered into the MTSA with IHG Tech to access and communicate with the Reservation System on its infrastructure.[8]

85.    Plaintiffs and Class Members are granted a limited right to access and use the Reservation System only in accordance with the MTA (and later the MSTA).

86.    In the MTSA, the recitals provide that "IHG Tech will facilitate Franchisee's access to Service Providers' Hardware, Software, and Services, and Franchisee will pay for, receive, and use such Hardware, Software, and Services in accordance with the terms of this Agreement, the Enabling Agreements, the Franchise Agreement, and any applicable Participation Agreement or Order Form[.]"[9] MTSA at 1.

87.    The MTSA in Section 3.1 also outlines the following Core Services: "IHG Tech or an IHG Tech Affiliate has entered into Enabling Agreements with

---

[8] The MTSA by and between IHG Tech and the franchisee, is **Exhibit C** to the FDD. Prior to 2020, SCH was the signatory and counterparty to the MTA (the predecessor to the MTSA).

[9] In the Recitals to the MTA, SCH acknowledged that "[t]he parties desire to establish the terms and conditions by which *Franchisee will acquire certain software, hardware and other services and training for the benefit of the Hotel, including without limitation terms and conditions for access and use of the SCH reservation system ("RS")*."

Service Providers to provide certain Hardware, Software, and Services. IHG Tech will make available to Franchisee the Hardware, Software, and Services for the core technology solutions set forth on Schedule 2 (Core Services) (the "Core Services"). These Core Services are provided by IHG Tech, an IHG Tech Affiliate or Service Providers and are required to operate a Hotel under an IHG Portfolio Brand. IHG Tech and/or its Service Provider may modify or cause to be modified the features and functionality of the Core Services in the ordinary course of technology development, and IHG Tech will notify Franchisee of any such material modification. In addition, IHG Tech reserves the right to add or remove Core Services or to replace any of the Core Services." *Id*. at 2.

88.    The MTSA, in Section 5.0, further details various fees, invoicing and payments for Core Services: "Each month, IHG Tech or an IHG Tech Affiliate will invoice Franchisee for the fees associated with the Core Services provided to Franchisee in the preceding month in accordance with the Franchise Agreement. Franchisee will pay the fees for the Core Services in accordance with the payment terms set forth in the Franchise Agreement."[10] *Id*. at 4.

---

[10] In the original MTA entered by Plaintiffs, Section 9 titled "Warranties; Limitation of Liability; Insurance," provides that SCH "warrants to Franchisee: (a) that so long as Franchisee shall not be in default of any of the provisions of this Agreement or the Franchise Agreement or except as otherwise provided herein, ***SCH will not disturb Franchisee's quiet and peaceful possession and enjoyment of the Approved Software; and (b) that the Approved Software will operate on the***

89.    The MTSA, in Section 7.0 acknowledges that "IHG Tech may, in its sole discretion, amend the Security Practices at any time without prior notice."[11] *Id.* at 6.

### C.    *IHG's Reservation System: IHG Concerto.*

90.    As mandated by IHG, all of its hotels must be linked to the central Reservation System, including all system enhancements and upgrades such as the RMS or such successor systems as SCH - or as of 2020 IHG Tech - may designate. That is, the license agreements and FDDs for each Plaintiff and all Class Members require them to use (and to pay for) IHG's reservation system which has gone by different names but is generally (and currently) referred to as IHG Concerto or the Reservation System.

91.    IHG Concerto is an IHG-proprietary, cloud-based computerized solution that provides key features needed to manage and operate a hotel. IHG Concerto includes many capabilities, such as reservations, rate management, inventory management and yielding and interactive homepage. The IHG Concerto

---

*Approved Equipment and will be adequate for its intended purpose with the R[eservation] S[ystem]."* (emphasis added).

[11] In the original MTA, in "Schedule 4 – Security Practices," SCH acknowledged the need for the use of "Reasonable Security Standards," which include "compliance with P[ayment] C[ard] I[nstitute] for systems that are within the scope of the PCI DSS, [] and other applicable standards as appropriate, such as ISO 27002, for systems that are not within the scope of the PCI DSS."

platform is also designed to support effective management of Hotel Content and quick response to Guest Relations issues.

92.    At the time of the Data Breach, pursuant to the Core Services outlined in the MTSA, IHG Tech contracted with and provided to Plaintiffs and Class Members network connectivity, system integration and system interfaces between Plaintiffs' and Class Members' hotels, IHG Concerto and other services comprising the IHG/Hotel ecosystem.

93.    Additionally, Plaintiffs and Class Members are required to enter agreements with IHG, allowing IHG to provide specific data security to Defendants' systems used by franchisees. Plaintiffs are required to pay fees for this service.

94.    Only IHG's approved hardware and/or software may be installed on the IHG Tech infrastructure. The Reservations Systems, IHG Concerto and Core Services are located on IHG Tech's infrastructure.

95.    The operations network of Plaintiffs' and Class Members' hotels is required to be and is kept separate and apart from IHG Tech's infrastructure.

96.    Neither Plaintiffs nor Class Members have any rights of ownership in the Reservations System, IHG Concerto and/or any component of the PMS.

97.    SCH exclusively owns and maintains the Reservations System, IHG Concerto and the PMS.

98.     SCH charges Plaintiffs and Class Members for the right to access the Reservations System.

99.     TeaPea, the third-party hacker, infiltrated IHG Concerto and took down the Reservation System on September 5, 2022, and those services were not restored until September 29, 2022.

**D.     *Franchisees Pay Initial & Monthly Fees for Use of IHG Concerto, the Online Reservation Platform.***

100.   Franchisees pay significant initial and ongoing fees to operate a franchise including, but not limited to, Hotel Openings Services & Transitions or the Openings and Renovations program, which provide services and training required to open a hotel in the System including HOLIDEX and IHG Concerto Ramp Up.

101.   Plaintiffs and Class members are required to pay IHG a monthly Service Contribution fee that is 3% of Gross Room Revenue for Holiday Inn brand group hotels, Holiday Inn resorts hotels and Holiday Inn Express brand group hotels.

102.   Plaintiffs and Class members are also required to pay IHG a Technology Fee in exchange for the provision of certain technology services including, but not limited to, maintaining the availability and usability of the Reservations System.

103.   Upon information and good faith belief, the monthly Technology Fee that Plaintiffs and Class Members pay IHG is currently $16.73 per room per month.

104.   Upon information and good faith belief, Plaintiffs and Class Members paid $16.08 per room per month at the time of the breach of the systems by TeaPea.

105.   Plaintiffs and Class members are required to pay IHG a monthly fee for IHG Concerto, Yield & Price Optimization—costs between $30 and $120 per month may apply for competitive rate insight shopping.[12]

106.   Plaintiffs and Class Members have not received the benefit of their bargain in that they have paid fees for services for network security and access to IHG Concerto for them and prospective guests, which did not happen for almost an entire month due to the Data Breach.

107.   If Plaintiffs had known IHG and IHG Tech did not have adequate data security employed on its systems, including IHG Concerto and that as a result IHG's systems would be compromised and hacked, Plaintiffs would not have agreed to pay these monthly fees or certainly not in the amounts they did.

**E.    The Current Data Security Incident.**

---

[12] The Monthly Fees IHG contract for Plaintiffs to pay are in addition to the Estimated Initial Investments, which include (for a 125-room, four-story Holiday Inn/Holiday Inn & Suites Hotel) but is certainly not limited to, the cost of PMS Equipment; Software; Installation & Training; IHG Concerto Equipment; NGP/Payments Equipment; Software; Installation and Training is between $83,000 and $96,000.

108.   When the Data Breach first occurred on September 5, 2022, IHG claimed for more than 24 hours that it was going through a "system maintenance" before releasing a statement that it had indeed been hacked.

109.   On September 6, 2022, IHG publicly acknowledged that its network was accessed by a third-party actor and that, as a result, its booking systems and mobile applications were compromised, inoperable and unavailable.[13]

110.   In that public filing with the London Stock Exchange, titled "Unauthorised access to technology systems," IHG reported that:

> parts of the Company's technology systems have been subject to unauthorised activity. IHG's booking channels and other applications have been significantly disrupted since yesterday, and this is ongoing.[14]

111.   IHG's brief statement included self-serving verbiage that it "is working to fully restore all systems as soon as possible and to assess the nature, extent and impact of the incident."

112.   While IHG's statement was, at least, correct in that its "technology systems" were "subject to unauthorised activity" which "significantly disrupted"

---

[13] *See* Hotel giant IHG blames cyberattack for booking systems outage, Sept. 7, 2022, https://techcrunch.com/2022/09/07/ihg-hotels-outage-cyberattack/ (last accessed Feb. 25, 2024).

[14] UNAUTHORISED ACCESS TO TECHNOLOGY SYSTEMS, Sept. 6, 2022, https://www.londonstockexchange.com/news-article/IHG/unauthorised-access-to-technology-systems/15617013 (last accessed Feb. 25, 2024).

"IHG's booking channels and other applications, the statement did not reveal IHG's role in allowing this foreseeable and preventable incident from happening.

113.   IHG did not reveal that TeaPea, a hacker group from Vietnam, gained access to IHG's internal IT network via an employee who downloaded a malicious piece of software through an email attachment.

114.   IHG's data security was so inadequate that it did not detect the malicious email attachment.

115.   Nor did IHG reveal that its internal database was "protected" using one of the most commonly used passwords worldwide, "Qwerty1234."

116.   The username and password to the vault were available to all employees, so the 200,000 staff could see, and the password was extremely weak.

117.   Defendants did not employ minimum industry standard security measure of the least privilege which limits users' access rights to only what is strictly required to do their jobs.

118.   With such a weak password, available to all employees and frequently used, it was foreseeable that the Reservations Systems would be hacked and rendered unusable.

119.   On September 6, 2022, IHG chief executive Keith Barr told franchise owners in an email that the company's technology systems (*i.e.*, IHG Concerto) had been "subject to unauthorized activity," which meant that IHG's booking channels,

reservations and customer care call centers and the IHG Help Desk "have been significantly disrupted since 5 September."

120. Mr. Barr's email continued that "[u]ntil this issue is addressed, guests will not be able to make bookings online, access their IHG One Rewards account, or contact the [Reservations & Customer Care]. However, hotels are currently able to take bookings and accept payments, except for initiating or amending any bookings made using IHG One Rewards points."

121. Additionally, because of the Data Breach, "IHG One Rewards members may be temporarily unable to use certain membership features while visiting our hotels."

122. On September 7, 2022, Mr. Barr sent a second email to "Owners of IHG hotels globally" explaining that additional platforms have been impacted: "IHG's booking channels (IHG Concerto), its Reservations & Customer Care (RCC) call centres and internal systems, such as Merlin and the IHG Help Desk, have been disrupted."

123.    Mr. Barr reported to the public that the hack had "significantly disrupted" the company's online booking, as well as its customer service centers and internal communications.[15]

124.    On September 20, 2022, Mr. Barr emailed Plaintiffs and Class Members explaining the steps IHG took to restore the technology systems. In this email, Mr. Barr explained that IHG has begun the process to reset passwords for all IHG users which is an important step to protect the security of hotels and IHG's technology systems.

125.    As of September 20, 2022, Plaintiffs reported that the IHG booking site, IHG Concerto, and Mobile sites were down and not working.

126.    On September 29, 2022, Mr. Barr emailed Plaintiffs and Class Members stating that IHG had re-activated their booking websites and mobile app together with most of the other booking channels and revenue-generating systems. He explained that subsequently, HIS's service at the Reservation & Customer Care (RCC) call centers has been recovered and all systems restored.

---

[15] Holiday Inn bookings tank after suspected ransomware attack: franchisees, Sept. 9, 2022, https://nypost.com/2022/09/09/holiday-inn-bookings-tank-after-security-breach-franchisees/ (last accessed Feb. 25, 2024).

127.   Mr. Barr also explained in his September 29, 2022, email that IHG continues to carry out additional steps as part of the recovery and assurance plans to review and further enhance security measures.

128.   Mr. Barr stated that external specialists were engaged to investigate the incident. However, he has not reported the results of that investigation to Plaintiffs and Class Members.

129.   In addition to the fact that IHG's reservation system and mobile applications were down, prospective guests could not book IHG-branded rooms on third-party sites such as Expedia and Booking.com.[16] This means that the typical discounted rates that guests would expect to see on websites like Expedia or Booking.com were not available, only the officially listed rates that are higher.

130.   IHG did not explain to Plaintiffs and Class Members how it planned to "be supporting hotel owners and operators as part of our response to the ongoing service disruption."[17]

---

[16] *See, e.g.*, Holiday Inn bookings tank after suspected ransomware attack: franchisees, September 9, 2022, https://nypost.com/2022/09/09/holiday-inn-bookings-tank-after-security-breach-franchisees/ (last accessed Feb. 25, 2024).

[17] In keeping with its tight-lipped approach, a spokesperson for IHG said that there was no more information available about when the system might be expected to be operational again and declined to comment about the nature of the cyber-attack. *See* Dozens of Louisiana hotels disrupted by IHG cyber-attack, September 7, 2022, https://www.nola.com/news/business/article_4380004e-2eda-11ed-b76c-bfed23864e77.html (last accessed Feb. 25, 2024).

131.    Although IHG refused to specify the type of incident involved, the attack "does look like it's ransomware, and IHG will likely be in negotiations with the attackers to try to restore access and get their systems back up and running."[18]

**F.    *The Previous IHG Data Breach in 2017.***

132.    This is not the first time that IHG's network and computer systems have been accessed or compromised.

133.    In December of 2016, IHG announced that it was made aware of a pattern of unauthorized charges occurring on payment cards that were used at a "small number of U.S.-based hotel locations," and began an investigation.[19]

134.    Initially thought to have been a minor breach that affected a couple of its properties, the actual scope of the 2016 attack was much more extensive.[20]

---

[18] *Suspected Ransomware Attack on InterContinental Hotels Affected Over 4,000 Guests*, Sept. 8, 2022, https://www.spiceworks.com/it-security/security-general/news/intercontinental-hotels-group-cyberattack-ransomware/ (last accessed Feb. 25, 2024).

[19] Hotel Card Data Breach Hits 1,200 US Locations, April 20, 2017, https://www.pymnts.com/news/security-and-risk/2017/hotel-card-data-breach-hit-1200-u-s-locations-intercontinental-fraud-malware-payment-card-franchise-hotels/ (last accessed Feb. 25, 2024).

[20] *Suspected Ransomware Attack on InterContinental Hotels Affected Over 4,000 Guests, supra*, note 17.

135.   That incident resulted in a three-month long data breach wherein 1,175 IHG properties were infected with malware to steal customers' financial information.

136.   On February 3, 2017, IHG announced that the security breach affected 12 of its locations.[21]

137.   In April of 2017, IHG expanded the number of affected locations to over 1,000 locations and finally issued a data breach notification letter to affected customers.[22]

138.   On May 5, 2017, a class action lawsuit was filed against IHG by a class of consumers alleging that lax data security standards resulted in hackers accessing sensitive payment information including card numbers, expiration dates, verification codes and cardholder names for debit or credit cards used at the hotels. *See Orr v. InterContinental Hotels Group PLC*, Case No. 1:17-cv-01622-MLB (N.D. Ga.).[23]

---

[21] IHG Notifies Guests of Payment Card Incident at 12 Properties in the Americas (Feb. 3, 2017), https://prnewswire.com/news-releases/ihg-notifies-guests-of-payment-card-incident-at-12-properties-in-the-americas-300401996.html (last accessed Feb. 25, 2024).

[22] InterContinental Hotel Chain Breach Expands (April 18, 2017), https://krebsonsecurity.com/2017/04/intercontinental-hotel-chain-breach-expands/ (last accessed Feb. 25, 2024).

[23] Plaintiffs alleged that "IHG failed to take adequate steps to prevent the installation of malware on its payment system, failed to recognize existing vulnerabilities in its payment system, and failed to detect the Security Breach." And that "[d]espite IHG's

139.   On September 2, 2020, a class settlement resolving that case was granted final approval by the court. *See* DE 2017-cv-01622 [ECF. 81].

## G.    *The Current Data Breach was Eminently Foreseeable & Preventable.*

140.   IHG was clearly aware of the threat of a data breach given its prior data security incident only a few years earlier, not to mention the numerous prior high-profile breaches that have occurred in the hospitality and other consumer-facing industries.

141.   IHG knew and publicly acknowledged that it and other hotel chains were prime targets for hackers given the significant amount of sensitive customer information it collects in the course of business.

142.   It is not surprising that hotels have been frequent targets for hackers.

143.   Cybersecurity expert Richard Gold, head of security engineering at the cybersecurity firm Digital Shadows, noted as early as December 1, 2018, that "hotels are an attractive target for hackers because they hold a lot of sensitive information,

---

awareness of its data security obligations, IHG's treatment of Private Information entrusted to it by its customers fell far short of satisfying IHG's legal duties and obligations and included violations of the PCI DSS. IHG failed to ensure that access to its data systems was reasonably safeguarded, failed to acknowledge and act upon industry warnings and failed to use proper security systems to detect and deter the type of attack that occurred and is at issue here."

including credit card and passport details, but often don't have security standards as tough as those of more regulated industries, like banking."[24]

144.    The number of data breaches occurring in the hospitality sector is long:

- On November 30, 2018, Marriott announced that it was subject to one of the largest data breaches in history when the sensitive personal and financial information of up to 500 million hotel guests was exfiltrated from its Starwood guest reservation database as part of an extensive, four-year long data breach;

- In October 2018, Radisson Hotels disclosed a data breach affecting Radisson Rewards members who had their names, company names, email addresses, addresses, phone numbers, Radisson Rewards member numbers and frequent flyer numbers accessed by an unauthorized party;

- In August 2018, China-based Huazhu Hotels Group announced a massive data breach where the personal information of hundreds of millions of hotel guests was exfiltrated and offered for sale on the dark web;

- In November 2017, Hilton Worldwide Holdings Inc. agreed to pay $700,000 and bolster its data security practices for mishandling data breaches in 2014 and 2015, including failing to maintain reasonable data security and failing to notify victims of the data breach in a timely manner;

- In October 2017, Hyatt announced that it discovered unauthorized access to payment card information at 41 of its properties worldwide. This announcement came on the heels of Hyatt's announcement in late 2015 that hackers had gained access to credit card systems at 250 properties in 50 different countries for a period spanning nearly four months, exposing customers' payment card

---

[24]    Breach    puts    hotel    guests'    data    at    risk,    Dec.    1,    2018, https://www.arkansasonline.com/news/2018/dec/01/breach-puts-hotel-guests-data-at-risk-2/ (last accessed Feb. 25, 2024).

data including cardholder names, numbers, expiration dates, and internal verification codes;

- In July 2017, multiple hotel chains including Hard Rock Hotels & Casinos, Four Seasons Hotels and Resorts, Trump Hotels, Loews Hotels, Kimpton Hotels & Restaurants, RLH Corporation, and Club Quarter Hotels, among others, reported a data breach via a third-party reservations system provided by Sabre Hospitality Solutions. The breach permitted unauthorized access to customers' credit card information and certain reservation information between August 2016 and March 2017;

- In 2016, IHG experienced cybersecurity incidents including; (a) at a number of Kimpton hotels that resulted in unauthorized access to guest payment card data (the Kimpton Security Incident); and (b) an incident that involved malware being installed on servers that processed payment cards used at restaurants and bars of 12 IHG managed properties (the Americas Security Incident);

- In June 2016, Hard Rock Hotel & Casino Las Vegas announced that after receiving reports of fraudulent activity associated with payment cards used at its hotel, the resort conducted an investigation revealing that malware had been installed on its servers allowing unauthorized access to customers' names, credit card numbers, expiration dates, and verification numbers;

- In November 2015, Noble House Hotels and Resorts announced a breach affecting six of its properties over different periods of time from December 29, 2014 to August 11, 2015. This breach also involved malware installed on Noble's POS systems and

- In March 2015, hotel chain Mandarin Oriental Hotel Group confirmed that its hotels were affected by a payment card breach indicating that some of the chain's POS systems were infected with malware capable of stealing customer card data.[25]

---

[25] *See also 5 Recent Luxury Hotel Data Breaches You Should Know About*, Aug. 18, 2021, https://www.upscalelivingmag.com/5-recent-luxury-hotel-data-breaches-you-should-know-about/ (last accessed Feb. 25, 2024).

145.   Given this long list of well-publicized breaches, it is foreseeable that hotels with inadequate data security make themselves a target for hackers, and it was foreseeable to IHG that their systems with weak data security would be hacked.

146.   Despite these well-publicized breaches, and the foreseeable risk of a data breach, IHG failed to undertake adequate analyses and testing of its own systems to ensure that similar vulnerabilities were remedied.[26]

147.   That is, despite being holders of Personally Identifiable Information for millions of individuals worldwide and providing the sole platform to Plaintiffs and Class Members on which reservations could be made, IHG failed to prioritize data security by failing to adopt reasonable data security measures that would prevent and detect unauthorized access to their highly sensitive databases.

148.   IHG, itself and through SCH And HHF, made significant expenditures to market their hotels and hospitality services. IHG had the resources to implement adequate data security to prevent a data breach but neglected to invest in data security and implement data security measures compliant with industry standards, including requiring the use of strong passwords and principle of least privilege,

---

[26] In addition to data breaches affecting the hospitality industry, IHG observed numerous, well-publicized data breaches involving other types of major corporations who were also targeted given the sensitive consumer information they retained.

despite the growing number of well-publicized data breaches affecting the hospitality and similar industries of which they were aware.

149. Just prior to the Data Breach, IHG publicly acknowledged that "[d]ynamic and external attacks against the hospitality industry have continued in 2021, with ransomware attacks in particular trending against technology providers, national infrastructure and supply chain. This has the potential to impact both IHG and our third-party providers."[27]

150. It was plainly foreseeable to each of the Defendants that a breach could happen and was even imminent, but they took no measures to safeguard their infrastructure.

## H. IHG's Public Statements Demonstrate that it was Aware of the Risks Posed by Lax Data Security, the Need to Enhance its Data Security Measures and that a Data Breach was Foreseeable.

151. IHG, through its various public statements, has not been shy to acknowledge the risks posed by the current cyber-security landscape and at least give lip service to its efforts to meet those risks.

152. For instance, in its 2019 annual report, IHG stated that "we want everyone, including guests booking via our reservation channels, members of our

---

[27] Our risk management, IHG Annual Report and Form 20-F 2021, https://www.ihgplc.com/~/media/Files/I/Ihg-Plc/investors/annual-report-2021/our-risk-management.pdf, p. 46 (last accessed Feb. 25, 2024).

loyalty programmes, **colleagues, shareholders and other stakeholders, to trust the way we manage their information and are addressing cybersecurity threats. We have standards, policies and procedures in place to manage how personal data should be used and protected.**" (emphasis supplied.)[28]

153.   IHG went on to note that "[i]nherent threats to cybersecurity and information governance remain significant and dynamic and external attacks against the hospitality industry have continued in 2020. **We are aware of our responsibilities in relation to a range of high-value assets (critical systems & guest, employee and other sensitive data) which may be targeted by various threat 'actors'** (including organised criminals, third parties and 'threat actor-employees'), and rapid evolution in societal, regulatory and media scrutiny of privacy arrangements mean that the potential impact of data loss to IHG financially, reputationally or operationally remains a dynamic risk factor." (emphasis supplied.)[29]

---

[28] True Hospitality for Everyone, IHG Annual Report and Form 20-F 2019, https://www.ihgplc.com/~/media/Files/I/Ihg-Plc/investors/shareholder-center/annual-reports-and-responsible-business-reports/annual-reports/2019/ihg-2019ar.pdf at 27 (last accessed Feb. 25, 2024) (emphasis added).

[29] True Hospitality for Good, IHG Annual Report and Form 20-F 2020, https://www.ihgplc.com/~/media/Files/I/Ihg-Plc/investors/shareholder-center/annual-reports-and-responsible-business-reports/annual-reports/2020/ihg-2020ar.pdf at 38 (last accessed Feb. 25, 2024) (emphasis added).

154.    Tellingly, IHG noted that "[c]yber breaches increasingly appear to be an unfortunate reality for most firms and **we therefore invest in trying to avoid them where reasonable and practical to do so** – in recognition of the possible impact of cybersecurity breaches beyond data loss on operational performance and regulatory actions or fines, as well as the potential impact on our reputation. The threats towards the hospitality industry and the Group's information are dynamic, and include cyber-attacks, fraudulent use, loss or misuse by employees and breaches of our vendors' security arrangements, amongst others." (emphasis supplied.)[30]

155.    Moreover, IHG has recognized the significant damage that such an incident can have on hotel owners: "[w]ith finances at a premium for hotel owners, our Information Security and Technology teams collaborate to provide reliable, scalable and cost-effective solutions, targeted at areas of greatest opportunity for future attacks."[31]

## I.    *IHG's Data Breach Harmed Plaintiffs & the Class.*

156.    As a result of IHG's most recent data security failings, Plaintiffs and the putative Class Members have suffered harm and direct, compensable damages.

---

[30] *Id*. at 226.
[31] *Id*. at 38.

157.    As a result of the Data Breach and IHG Concerto being down, Plaintiffs and Class Members could not make reservations using the IHG Concerto system that they were under contract with IHG to use.

158.    As a result, revenue was severely impacted and significantly decreased during the days IHG Concerto was taken down by TeaPea resulting in Plaintiffs having no access.

159.    The bookings at Plaintiffs' and Class Members' hotels are significantly decreased as a direct result of the Data Breach. Simply put, due to the Data Breach, the Hotels lost revenue as prospective guests could not book their reservations.

160.    If the IHG Concerto reservation platform had not been compromised as a result of each of the Defendants' actions and inactions as detailed herein, the reservations for occupancy for the days affected would be significantly higher particularly so since as a result of the COVID-19 pandemic, guests typically wait until the last minute to book hotels.

161.    As outlined above, Plaintiffs and the Class Members paid numerous fees to IHG, pursuant to the License Agreements and MTSAs, for which they have not received their benefit of the bargain.

162.    Plaintiffs and Class Members paid fees to IHG on rooms for which they were unable to make reservations and had they known IHG Concerto would be hacked, they would not have agreed to pay these higher monthly fees.

41

163.    Plaintiffs and Class Members are truly at the mercy of IHG in that the License Agreement mandates that they have no choice but to use and to pay for IHG Concerto, Core Services and IHG Tech infrastructure but in the event of a data security incident that compromises the system and, in turn, makes it impossible for guests to book rooms on IHG Concerto (not to mention third party booking sites like Expedia and Booking.com), there is no recourse for them to obtain compensation.

164.    Plaintiffs and the Class Members are not receiving the contractually promised customer service; IHG's internal systems were down for an extended period due to a third-party hacker, and IHG did nothing to assist Plaintiffs and Class Members during the days following the Data Breach. Instead, it fell on Plaintiffs and Class Members to staff hotels with manpower to compensate for IHG Concerto being taken down by TeaPea.

165.    Plaintiffs and Class Members are required to use IHG's reservation platforms on which IHG failed to implement adequate data security resulting in a cyberattack making these platforms unavailable to Plaintiffs and Class Members and unfairly imposing upon Plaintiffs' and Class Members' customer service departments.

166.    As a result of the Data Breach, Plaintiffs and Class Members have suffered the loss of good will of their guests as they are upset with the outage and scared about their PII being stolen and leaked.

167.  As a result of the Data Breach, guests are reluctant to book with Plaintiffs and Class Members.

168.  As a result of the Data Breach, Plaintiffs and Class Members have received lower Guest Love Scores, placing some Class Members at risk of IHG imposing mandatory actions and additional program fees.

169.  As a result of the Data Breach, the Plaintiffs and Class Members could not access their internal systems to provide IHG One Rewards members their status and elite benefits.

170.  Defendants claimed that Booking.com was sending reservations *via* email, but that those reservations must be manually entered at the hotel.

171.  Plaintiffs and Class Members have lost additional revenue because canceled reservations cannot be reconciled.

172.  In addition to lost bookings and revenue, Plaintiffs and the Class Members lost a significant number of employee work hours because reservations that had been previously booked "had to be redone again at the property when the guest arrived" by Plaintiffs' employees.

173.  Plaintiffs and Class Members have incurred additional expenses having to staff hotels with additional manpower to manually make reservations and resolve cancelled reservations.

43

174. As a result of the Data Breach, Plaintiffs' and Class Members' staff and General Managers have experienced ongoing delays and frustrations having to deal repeatedly with the same problems each shift every day as a result of the Data Breach.

175. Plaintiffs and Class Members did not receive the benefit of their bargain with each of the Defendants because they paid fees for the value of services (IHG Concerto, Core Services and IHG Tech infrastructure) they expected, but did not receive.

## GEORGIA LAW SHOULD APPLY TO PLAINTIFFS AND THE CLASS AS A WHOLE

176. The State of Georgia has a significant interest in regulating the conduct of businesses operating within its borders.

177. That is to say, Georgia, which seeks to protect the rights and interests of Georgia and all residents and citizens of the United States against a company headquartered and doing business in Georgia, has a greater interest in the claims of Plaintiffs and the Class than any other state and is most intimately concerned with the claims and outcome of this litigation.

178. The principal places of business of Defendants HHF, SCH, IHG and IHG Tech are located at Three Ravinia Drive, Suite 100 in Atlanta, Georgia 30346, the "nerve center" of their business activities—the place where its high-level officers

direct, control, and coordinate Defendants' activities, including major policy, financial and legal decisions.

179.    Defendants HHF's, SCH's, IHG's and IHG Tech's actions and corporate decisions surrounding the allegations made herein were made from and in Georgia.

180.    Defendants' breaches of duty to Plaintiffs and Class Members emanated from Georgia.

181.    Application of Georgia law to the Class with respect to Plaintiffs' and the Class's claims is neither arbitrary nor fundamentally unfair because Georgia has significant contacts and a significant aggregation of contacts that create a state interest in the claims of Plaintiffs and the Class.

182.    Moreover, the License Agreement states that it "shall be deemed made and entered into in the State of Georgia… Any and all disputes between the parties, whether sounding in contract, tort or otherwise, shall be governed and construed under, and in accordance with, the laws and decisions (except any conflicts of law provisions) of the State of Georgia." *See* License Agreement, § 14(B)(1).

183.    Under Georgia's choice of law principles, which are applicable to this action, the common law of Georgia applies to the nationwide common law claims of all Class members.

184.   In addition, given Georgia's significant interest in regulating the conduct of businesses operating within its borders, and that Georgia has the most significant relationship to Defendants, as their principle places of business are located in Georgia and their executives and officers are located and made decisions which led to the allegations of this litigation there, there is no conflict in applying Georgia law to non-resident consumers such as Plaintiffs and the Class.

## CLASS ACTION ALLEGATIONS

185.   Pursuant to Federal Rules of Civil Procedure 23(a) and (b), Plaintiffs bring this action on behalf of themselves and the Class of similarly situated persons and entities defined as:

> **All United States residents (including persons and business entities) that own or operate or have operated a hotel licensed pursuant to a License Agreement with HFF and/or its affiliates and were a licensee at any point in September of 2022.**

186.   Excluded from the Class are the officers, directors and employees of Defendants and their respective legal representatives, heirs, successors and assigns.

187.   Plaintiffs reserve the right to, after conducting discovery, modify, expand or amend the above Class definitions or to seek certification of a class or subclasses defined differently than above before any court determines whether certification is appropriate.

**A.    *Rule 23(a) Requirements.***

188. **Numerosity:** Consistent with Rule 23(a)(1), members of the Class are so numerous and geographically dispersed that their individual joinder is impractical. The precise identities, number and addresses of members of the Class are presently unknown to Plaintiffs but may and should be known with proper and full discovery of Defendants, third parties and all relevant records and documents.

189. Upon information and good faith belief, members of the Class number in the thousands. All members of the Class assert claims for violation of the law as set forth herein.

190. **Existence of Common Questions of Fact and Law:** Consistent with Fed. R. Civ. P. 23(a)(2) and with 23(b)(3)'s commonality and predominance requirements, this action involves common questions of law and fact which predominate over any questions affecting individual Class members. There is a well-defined commonality and community of interest in the questions of fact and law affecting the members of the Class.

191. Such common questions of law or fact include, *inter alia*:

- Whether IHG failed to use reasonable care and commercially reasonable methods to secure and safeguard IHG's Concerto Platform;

- Whether IHG properly implemented its purported security measures to protect Plaintiffs' and Class members' Private Information from unauthorized capture, dissemination and misuse;

- Whether IHG took reasonable measures to determine the extent of the Security Breach after it first learned of same;

- Whether IHG's conduct constitutes breach of an implied contract;

- Whether IHG willfully, recklessly, or negligently failed to maintain and execute reasonable procedures designed to prevent unauthorized access to IHG Concerto and IHG Tech's Infrastructure;

- Whether IHG was negligent in failing to properly secure and protect IHG Concerto and IHG Tech's Infrastructure that Plaintiffs and Class Members are required to use at their Hotels;

- Whether Plaintiffs and the Class Members are entitled to damages, injunctive relief, or other equitable relief, and the measure of such damages and relief;

- Whether Defendants knew or should have known that its data environment and cybersecurity measures created a risk of a data breach;

- Whether Defendants controlled and took responsibility for protecting IHG Concerto and IHG Tech's infrastructure upon which Plaintiffs and Class Members relied for making reservations;

- Whether Defendants' security measures were reasonable in light of the FTC data security recommendations, state laws and guidelines, industry standards, and common recommendations made by data security experts;

- Whether Defendants acted in bad faith by abrogating their responsibility to protect the platforms they required Plaintiffs and Class Members use;

- Whether Defendants owed Plaintiffs and the Class a duty to implement reasonable security measures on IHG Concerto and IHG Tech's infrastructure so they would not fall prey to a cyber-attack;

- Whether Defendants' failure to implement reasonable data security measures allowed the breach of their reservation systems and infrastructure to occur and caused Plaintiffs and Class Members to sustain damages as a result of decreased reservations;

- Whether reasonable security measures known and recommended by the data security community could have prevented the breach;

- Whether Plaintiffs and the Class were injured and suffered damages or other losses because of Defendants' failure to reasonably protect its reservation system and infrastructure;

- Whether Plaintiffs and Class Members were deprived of the benefit of the bargain by paying franchisee fees to Defendants they otherwise would not have paid had they known of Defendants' inadequate data security on their reservation platform and infrastructure;

- Whether Plaintiffs and the Class are entitled to relief; and,

- Whether Plaintiff and Class members are entitled to an award of reasonable attorneys' fees, prejudgment interest, and costs of suit.

192. **Typicality**: Consistent with Fed. R. Civ. P. 23(a)(3), Plaintiffs are typical members of the Class. Plaintiffs' claims have a common origin and share common bases with the Class Members. They originate from Defendants' same Franchise Agreements and Franchise Disclosure Documents and Defendants failure to implement adequate data security on its reservation platform and infrastructure that every Plaintiff and Class Member is required to use and for which they are required to pay franchise fees. If brought and prosecuted individually, the claims of

each Class member would necessarily require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief.

193. **Adequacy**: Consistent with Fed. R. Civ. P. 23(a)(4), Plaintiffs are adequate representatives of the Class because Plaintiffs are members of the Class and are committed to pursuing this matter against Defendants. Plaintiffs' interests do not conflict with the interests of the Members of the Class they seek to represent. Plaintiffs have retained competent counsel and intend to prosecute this action vigorously. Plaintiffs' counsel will fairly and adequately protect the interests of the members of the Class.

**B.    *Rule 23(b)(2) & (3) Requirements.***

194. This lawsuit may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) because Plaintiffs and the Class seek declaratory and injunctive relief, and all of the above requirements of numerosity, common questions of fact and law, typicality, and adequacy are satisfied. Moreover, Defendants have acted on grounds generally applicable to Plaintiffs and the Class as a whole, thereby making declaratory and/or injunctive relief proper and suitable remedies.

195. This lawsuit may also be maintained as a class action under Federal Rule of Civil Procedure 23(b)(3) because questions of fact and law common to the Class predominate over the questions affecting only individual members of the

Class, and a class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by each individual Class Member may be disproportionate to the burden and expense of individual prosecution of complex and extensive litigation to proscribe Defendants' conduct and practices.

196.    Additionally, effective redress for each and every Class Member against Defendants may be limited or even impossible where serial, duplicate, or concurrent litigation occurs arising from these disputes. Even if individual Class Members could afford or justify the prosecution of their separate claims, such an approach would compound judicial inefficiencies and could lead to incongruous and conflicting judgments against Defendants.

## COUNT I

### BREACH OF LICENSE AGREEMENTS
### (Against HHF)

197.    Plaintiffs incorporate by reference paragraphs 1-196 as if set forth at length herein.

198.    At all times relevant to this litigation, Defendant HHF possessed individual virtually identical contractual relationships with each Plaintiff and Class Member through the License Agreements.

199.    By virtue of their ownership of HHF and control over the IHG Marketplace, Defendants IHG and SCH are intended third-party beneficiaries of the

License Agreements. (The License Agreement's nomenclature identifies Holiday Hospitality Franchising, LLC as "IHG").

200.    The License Agreement requires, in paragraph 3.B.(1)(c), licensees to pay IHG "a monthly Technology Services Fee of $16.08 for each guest room at the Hotel **to be used by IHG for provision of technology services, such as, but not limited to satellite communications services to the Hotel**, plus such increases as IHG may judge reasonable, but in no case exceeding in any calendar year 10% of the fee in effect at the beginning of that year (the Technology Services Fee does not include the cost, installation, maintenance or repair of any equipment at the Hotel)." *Id*. at B-4.

201.    And, in Section 4, entitled "IHG's RESPONSIBILITIES," HHF covenants that "[d]uring the License Term, so long as Licensee is in full compliance with its obligations hereunder, *IHG will afford Licensee access to reservation service for the Hotel on terms consistent with this License*." (emphasis added). *Id*. at B-5.

202.    In that same Section 4, HHF states that IHG "will make available and use Services Contribution funds for various activities as may be computed on the basis generally applicable to licensees of the System." *Id*. at B-6.

203.   Through the License Agreements, Defendant HHF required licensees—Plaintiffs and Class Members—to pay a monthly Technology Fee.[32]

204.   At the time of the Data Breach, Plaintiffs and Class Members paid the required monthly Technology Fees to IHG.

205.   Pursuant to IHG's responsibilities as Licensor's under the License Agreements, IHG agreed to afford Plaintiffs and Class Members access to reservation service for their Hotels.

206.   As a result of the Data Breach, Plaintiffs were unable to access the reservation service as outlined in the License Agreements.

207.   Defendant HFF breached the express contracts within the License Agreements because the agreements state that HHF would ensure IHG provided the requisite services outlined in the agreement, including access to the reservations service.

208.   Thus, Defendant HHF breached the License Agreements.

209.   As a direct and proximate result of HHF's ongoing breaches of contract, Plaintiffs have sustained actual losses and damages as described in detail above, including they did not get the benefit of the bargain for which they paid. Plaintiffs

---

[32] Prior to 2020, this fee was paid to SCH pursuant to the prior MTA.

and Class Members have suffered monetary damages in an amount to be proven at trial.

## COUNT II

### BREACH OF MASTER TECHNOLOGY SERVICE AGREEMENTS
### (Against SCH & IHG Tech)

210.   Plaintiffs incorporate by reference paragraphs 1-196 as if set forth at length herein.

211.   At all times relevant to this litigation, Plaintiffs and Class Members were provided a FDD that explains the franchise arrangement and contractual requirements that govern the parties' relationships.

212.   The FDDs are accompanied by agreements that the parties must execute in connection with becoming a licensee in the IHG system.

213.   As a result, the FDDs impose duties and obligations on Defendants.

214.   In particular, the FDD requires franchisees, Plaintiffs and Class Members, to enter into contracts with IHG Tech and to pay Defendants technology fees for use of Defendants' reservation platform, IHG Concerto, Core Services and IHG Tech Infrastructure.

215.   As of 2020, the FDD required Plaintiffs and Class Members to enter into the MTSA with Defendant IHG Tech in order to access and communicate with the Reservation System.

216. Plaintiffs and Class Members entered into the MTSA with Defendant IHG Tech.[33]

217. Plaintiffs and Class Members are granted a limited right to access and use the Reservation System only in accordance with the MTA (and later the MSTA).

218. In the MTSA, the recitals provide that "IHG Tech will facilitate Franchisee's access to Service Providers' Hardware, Software, and Services, and Franchisee will pay for, receive, and use such Hardware, Software, and Services in accordance with the terms of this Agreement, the Enabling Agreements, the Franchise Agreement, and any applicable Participation Agreement or Order Form[.]"

219. The MTSA in Section 3.1 also outlines the following Core Services: "IHG Tech or an IHG Tech Affiliate has entered into Enabling Agreements with Service Providers to provide certain Hardware, Software, and Services. IHG Tech will make available to Franchisee the Hardware, Software, and Services for the core technology solutions set forth on Schedule 2 (Core Services) (the "Core Services"). These Core Services are provided by IHG Tech, an IHG Tech Affiliate or Service Providers and are required to operate a Hotel under an IHG Portfolio Brand. IHG

---

[33] Prior to 2020, the FDD required Plaintiffs and Class Members to enter into the MTA with Defendant SCH in order to access and communicate with the Reservation System. Prior to 2020, Plaintiffs and Class Members entered into the MTA with Defendant SCH.

Tech and/or its Service Provider may modify or cause to be modified the features and functionality of the Core Services in the ordinary course of technology development, and IHG Tech will notify Franchisee of any such material modification. In addition, IHG Tech reserves the right to add or remove Core Services or to replace any of the Core Services."

220.   The MTSA, in Section 5.0, further details various fees, invoicing and payments for Core Services: "Each month, IHG Tech or an IHG Tech Affiliate will invoice Franchisee for the fees associated with the Core Services provided to Franchisee in the preceding month in accordance with the Franchise Agreement. Franchisee will pay the fees for the Core Services in accordance with the payment terms set forth in the Franchise Agreement."

221.   The MTSA, in Section 7.0 acknowledges that "IHG Tech may, in its sole discretion, amend the Security Practices at any time without prior notice."

222.   As a result of the Data Breach, Plaintiffs and Class Members were unable to access or use the Reservation System. Defendant IHG Tech breached the MTSA with Plaintiffs and Class Members during the period when they could not access the Reservation System.

223.   Likewise, Defendant SCH as the sole member of IHG Tech breached the MTSA with Plaintiffs and Class Members during the period when they could not access the Reservation System.

224. As part of MTA, Defendant SCH acknowledges the importance of network security.

225. As part of MTSA, Defendant IHG Tech acknowledges the importance of network security.

226. Yet Defendants SCH and IHG Tech did not ensure adequate and reasonable security measures to protect Plaintiffs and Class Members from the Data Breach.

227. As a direct and proximate result of Defendants IHG Tech's and SCH's ongoing breaches of contract, Plaintiffs have sustained actual losses and damages as described in detail above, including they did not get the benefit of the bargain for which they paid. Plaintiffs and Class Members have suffered monetary damages in an amount to be proven at trial.

## COUNT III

### VIOLATIONS OF GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT
### O.C.G.A. §§ 10-1-370, *et seq.*
### (Against IHG, SCH, HHF & IHG Tech)

228. Plaintiffs incorporate by reference paragraphs 1-196 as if set forth at length herein.

229. Plaintiffs and Class Members are "persons" within the meaning of O.C.G.A. § 10-1-371(5) of the Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA").

230.    Defendants IHG, SCH, HHF and IHG Tech engaged in deceptive trade practices in the conduct of their business, in violation of Ga. Code § 10-1-372(a), including:

- Representing that goods or services have characteristics that they do not have;

- Representing that goods or services are of a particular standard, quality, or grade if they are of another;

- Advertising goods or services with intent not to sell them as advertised;

- Engaging in other conduct that creates a likelihood of confusion or misunderstanding.

231.    The deceptive trade practices of IHG, SCH, HHF and IHG Tech include, *inter alia*:

- Implementing and maintaining cybersecurity and privacy measures that were knowingly insufficient which was a direct and proximate cause of the Data Breach;

- Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures to its Concerto platform and IHG Tech infrastructure despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

- Failing to comply with common law and statutory duties pertaining to the security and privacy of individuals making reservations on the Concerto platform including duties imposed by the Federal Trade Commission Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach and

58

- Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure the Concerto platform and IHG Tech infrastructure.

232.    The omissions of Defendants IHG, SCH, HHF and IHG Tech were material because they were likely to and did deceive Plaintiffs and Class Members about the adequacy of its data security on the IHG Concerto™ platform and ability to protect the platform from a cyberattack.

233.    Had Defendants IHG, SCH, HHF and IHG Tech disclosed to Plaintiffs and Class Members that their cybersecurity on IHG Concerto and IHG Tech infrastructure were not secure and, thus, vulnerable to attack, IHG would have been unable to continue in business and would have been forced to adopt reasonable data security measures and comply with the law.

234.    Instead, Defendants IHG, SCH, HHF and IHG Tech required Plaintiffs and Class Members to use IHG Concerto™ and IHG Tech infrastructure to make reservations for which Plaintiffs and Class Members paid significant franchisee fees. In collecting these fees, IHG omitted and concealed information from Plaintiffs and Class Members (1) that IHG's data security practices were knowingly insufficient to maintain the safety of their platforms and (2) that IHG was not compliant with basic data security requirements and best practices to prevent a Data Breach.

235.    As a direct and proximate result of the actions of Defendants IHG, SCH, HHF and IHG Tech, Plaintiffs and Class Members have suffered and will

continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages.

236.   Plaintiffs and the Class Members seek all relief allowed by law, including injunctive relief and reasonable attorneys' fees and costs under Ga. Code § 10-1-373.

## COUNT IV

### NEGLIGENCE
### (Against IHG, SCH, HHF & IHG Tech)

237.   Plaintiffs incorporate by reference paragraphs 1-196 as if set forth at length herein.

238.   Defendants IHG, SCH, HHF and IHG Tech owe numerous duties to Plaintiffs and the other Members of the Class. These duties include:

- exercising reasonable care in securing and safeguarding the Reservations System, IHG Concerto™ to and the IHG Tech infrastructure from a cyberattack;

- using reasonable and adequate security procedures that are compliant with the PCI-DSS standards and with industry-standard practices and

- implementing processes to quickly detect a data breach and to timely act on warnings about data breaches, including promptly notifying Plaintiffs and the other Members of the Class of the Data Breach.

239. Defendants IHG, SCH, HHF and IHG Tech knew or should have known the risks of collecting and storing PII on the IHG Concerto™ platform and IHG Tech infrastructure, the target these would be to hackers and the impact to Plaintiffs and Class Members if these systems were taken down.

240. Defendants IHG knew of the many breaches that targeted other hotel chains in the months before the Data Breach. Given the industry, a data breach was foreseeable to Defendants.

241. Defendants IHG, SCH, HHF and IHG Tech breached the duties it owes to Plaintiffs and Class members in several ways, including:

- by failing to implement adequate security systems, protocols and practices sufficient to protect their Reservations System, IHG Concerto platform and IHG Tech infrastructure from a cyberattack and thereby creating a foreseeable risk of harm;

- by failing to comply with the minimum industry data security standards, including the PCI-DSS, during the period of the Data Breach and

- by failing to timely and accurately disclose to Plaintiffs and Class Members the Data Breach and failing to implement a new reservation system or assist with delays, cancellations and customer care.

242. But for the wrongful and negligent breach of the duties that Defendants IHG, SCH, HHF and IHG Tech owed to Plaintiffs and the other Class Members, the

Reservations System, IHG Concerto™ platform and/or IHG Tech infrastructure would not have been hacked and taken offline.

243.  The injury and harm that Plaintiffs and the other Class members suffered was the direct and proximate result of Defendants' negligent conduct and was foreseeable.

244.  As a direct and proximate result of Defendants' negligence, Plaintiffs and the Class Members have been injured as described herein and are entitled to damages in an amount to be proven at trial.

245.  Plaintiffs and Class Members' injuries include, but are not limited to, the following:

- Paying fees for Reservations Systems, IHG Concerto™, Core Services, and IHG Tech infrastructure they would not have otherwise paid for and/or paying more for these platforms than they otherwise would have paid, had they known the truth about Defendants' substandard data security practices;

- Costs associated with having to pay additional employees to manually make reservations and reconcile canceled reservations;

- Costs associated with revenue lost for decreased reservations that were not made at Plaintiffs' and Class Members' Hotels because Defendants' systems were hacked;

- Loss of good will with customers of Plaintiffs and Class Members because reservations could not be made and IHG One Rewards could not be accessed;

- Decreased Love Score Ratings and associated penalties; and,

- Costs associated with time spent and the loss of productivity from taking time to address and attempt to mitigate and address the consequences of the Data Breach at the Hotels.

### COUNT V

### NEGLIGENCE *PER SE*
### (Against IHG, SCH, HHF & IHG Tech)

246.   Plaintiffs incorporate by reference paragraphs 1- 196 as if set forth at length herein.

247.   Defendants' IHG, SCH, HHF and IHG Tech unreasonable and inadequate data security measures and failure to timely notify Plaintiffs and the Class of the Data Breach violates Section 5 of the FTC Act. The FTC Act and Section 5 of the FTC Act require businesses to institute reasonable data security measures and breach notification procedures, which Defendants failed to do.

248.   Section 5 of the FTCA, 15 U.S.C. §45, prohibits "unfair. . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like Defendants of failing to implement and use reasonable measures to protect platforms on which they collect PII. Various FTC publications and orders also form the basis of Defendants' duty.

249.   Defendants IHG, SCH, HHF and IHG Tech violated Section 5 of the FTC Act by failing to use reasonable measures to secure their Reservations System,

IHG Concerto and IHG Tech infrastructure which collects PII and sensitive data and by not complying with applicable industry standards.

250.   Defendants IHG's, SCH's, HHF's and IHG Tech's conduct was particularly unreasonable given the sensitive nature and amount of data they collected and stored and the foreseeable consequences of a Data Breach at Plaintiffs and Class Members' Hotels should Defendants fail to secure its systems.

251.   Defendants IHG's, SCH's, HHF's and IHG Tech's violation of Section 5 of the FTC Act constitutes negligence per se.

252.   Plaintiffs are within the class of persons Section 5 of the FTC Act was intended to protect.

253.   As a direct and proximate result of Defendants IHG's, SCH's, HHF's and IHG Tech's negligence per se, Plaintiffs and the Class have suffered and continue to suffer injury and are entitled to damages in an amount to be proven at trial.

## <u>COUNT VI</u>

### <u>RECOVERY OF EXPENSES OF LITIGATION O.C.G.A. § 13-6-11</u><br><u>(Against IHG, SCH, HHF & IHG Tech)</u>

254.   Plaintiffs incorporate by reference paragraphs 1-196 as if set forth at length herein.

255.   Pursuant to O.C.G.A. § 13-6-11, the jury may allow the expenses of litigation and attorneys' fees as part of the damages where a defendant "has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense."

256.   Defendants IHG, SCH, HHF and IHG Tech through their actions alleged and described herein acted in bad faith, were stubbornly litigious, or caused the Plaintiffs and the Class Members unnecessary trouble and expense with respect to the transaction or events underlying this litigation.

257.   As numerous data security experts and data security standards make clear, even bare minimum measures can protect stored data from a data breach. The Data Breach was foreseeable given that IHG was hacked years earlier as were other hotels in the industry. Yet, Defendants IHG, SCH, HHF and IHG Tech refused to do the bare minimum to implement adequate data security measures demonstrating their bad faith. And, to this day, it is unknown whether IHG Concerto™ and the IHG Tech infrastructure are secure.

258.   As further described above, Plaintiffs and the Class have been injured and suffered losses directly attributable to the Data Breach.

259.   Plaintiffs therefore request that their claim for recovery of expenses of litigation and attorneys' fees be submitted to the jury, and that the Court enter a

Judgment awarding their expenses of litigation and attorneys' fees pursuant to O.C.G.A. § 13-6-11.

## COUNT VII

### DECLARATORY & INJUNCTIVE RELIEF
### (Against IHG, SCH, HHF & IHG Tech)

260.   Plaintiffs incorporate by reference paragraphs 1-196 as if set forth at length herein.

261.   Under the Declaratory Judgment Act, 28 U.S.C. §§2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as those alleged herein, which are tortious, and which violate the terms of the federal and state statutes described above.

262.   An actual controversy has arisen in the wake of the Data Breach at issue regarding Defendants IHG's, SCH's, HHF's and IHG Tech's common law and other duties to act reasonably with respect to safeguarding the reservations systems and infrastructure that Plaintiffs and the Class are required to use and for which they are required to pay fees and are required to enter consumers' PII.

263.   Plaintiffs allege Defendants IHG's, SCH's, HHF's and IHG Tech's actions in this respect were inadequate and unreasonable and, upon information and belief, remain inadequate and unreasonable.

264.    Additionally, Plaintiffs and the Class continue to suffer injury due to the continued and ongoing threat of the reservations systems going down as a result of the Data Breach because Defendants IHG, SCH, HHF and IHG Tech have provided no information regarding the actions they have taken to safeguard the Reservations System, IHG Concerto™ and IHG Infrastructure.

265.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

266.    Defendants IHG, SCH, HHF and IHG Tech owed, and continue to owe, a legal duty to secure the Reservations System, IHG Concerto and IHG Infrastructure that they require Plaintiffs use, and to secure the sensitive information that Defendants collect and store on their systems.

267.    Defendants IHG, SCH, HHF and IHG Tech breached, and continue to breach, their legal duty by failing to employ reasonable measures to secure the Reservations Systems, IHG Concerto™ and IHG Infrastructure that it requires Plaintiffs and the Class to use and on which it stores customers' personal information.

268.    Defendants' breach of their legal duties continues to cause harm to Plaintiffs and the Class.

269.    The Court should also issue corresponding injunctive relief requiring Defendants IHG, SCH, HHF and IHG Tech to employ adequate security protocols

consistent with industry standards to protect the Reservations System, IHG Concerto and IHG Tech Infrastructure.

270.   If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another breach of Defendants' data systems.

271.   If another breach of Defendants' data systems occurs, Plaintiffs and the Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages, while warranted to compensate Plaintiffs and the Class for their damages that are legally quantifiable and provable, do not cover the full extent of injuries suffered by Plaintiffs and the Class.

272.   The hardship to Plaintiffs and the Class if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

273.   Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another

data breach, thus eliminating the injuries that would result to Plaintiffs, the Class, and the public at large.

## COUNT VIII

### UNJUST ENRICHMENT (IN THE ALTERNATIVE)
### (Against IHG, SCH, HHF & IHG Tech)

274.   Plaintiffs incorporate by reference paragraphs 1-196 as if set forth at length herein.

275.   Plaintiffs and the other Class Members conferred a monetary benefit on IHG. Specifically, Plaintiffs and the other Class members were required to use Defendants' Reservations System, IHG Concerto and IHG Tech Infrastructure for reservations at their Hotels.

276.   Plaintiffs and Class Members paid fees to Defendants IHG, IHG Tech, and HHF pursuant to the license agreements and MTSA to use these platforms for reservations at their Hotels.

277.   Defendant SCH is the managing member of both Defendants IHG Tech and HHF. Defendant IHG is Defendant SCH's parent company. As such, both Defendants SCH and IHG (in addition to Defendants IHG Tech and HHF) were similarly unjustly enriched by payment of fees by Plaintiffs and Class Members.

278.   In exchange, Defendants IHG Tech and HHF, as well as Defendants SCH and IHG, should have protected the Reservations Systems, IHG Concerto and

IHG Tech infrastructure from a cyberattack. Instead, these platforms had inadequate data security and Defendants allowed them to be the subject of a cyberattack. As a result, Plaintiffs and Class Members could not make reservations at their Hotels.

279.   Defendants IHG, SCH, HHF and IHG Tech knew that Plaintiffs and the other Class Members conferred a benefit on Defendants and profited from Plaintiffs' and the other Class Members' use of IHG Concerto to make reservations at their Hotels because Defendants required them to use IHG Concerto and collected fees from Plaintiffs and Class Members for using IHG Concerto.

280.   IHG failed to secure the Reservations System, IHG Concerto and IHG Tech infrastructure from the Data Breach. Defendants inequitably acquired fees from Plaintiffs and Class Members for the required use of IHG Concerto™, but they were unable to use IHG Concerto to make reservations and lost revenue because of Defendants' inadequate data security.

281.   In the event that the License Agreements, MSTAs and FDDs are deemed inapplicable (which Plaintiffs deny) or otherwise unenforceable, Plaintiffs and the other Class Members have no adequate remedy at law.

282.   Under the circumstances, it would be unjust for Defendants to be permitted to, among other things, retain fees paid by Plaintiffs and Class Members for the use of IHG Concerto. Additionally, Plaintiffs and Class Members have and will continue to suffer low Love Guest scores for which Defendants penalize them

monetarily. It would be unjust for Defendants to retain fees paid by Plaintiffs for lower Guest Love scores.

283.   Defendants should be compelled to disgorge into a common fund or constructive trust for the benefit of Plaintiffs and the other Class Members fees that Defendants unjustly received from them. In the alternative, Defendants should be compelled to refund the amounts that Plaintiffs and the other Class members overpaid.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiffs Park 80 Hotels, LLC, PL Hotels, LLC, Mayur Patel, JSK Exton LLC, JAY Z. Kuber Hospitality, Inc., Parmattma Corporation, Synergy Hotels, LLC and PH Lodging Tomball, LLC, individually and on behalf of the other Members of the Class proposed herein, respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

A.   Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiffs Park 80 Hotels, LLC, PL Hotels, LLC, Mayur Patel, JSK Exton LLC, JAY Z. Kuber Hospitality, Inc., Parmattma Corporation, Synergy Hotels, LLC and PH Lodging Tomball, LLC as Class Representatives, and appointing undersigned counsel as Lead Counsel for the Class;

B.   Ordering Defendants to pay actual damages to Plaintiffs and the other Members of the Class;

C.   Alternatively, ordering Defendants be disgorged of

fees:

D.     A declaratory judgment in favor of Plaintiffs and the Class;

E.     Injunctive relief to Plaintiffs and the Class;

F.     Ordering Defendants to pay attorneys' fees and litigation costs to Plaintiffs pursuant to O.C.G.A. § 13-6-11 and as otherwise allowed by law;

G.     Ordering Defendants to pay both pre- and post-judgment interest on any amounts awarded and

H.     Ordering such other and further relief as may be just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury of all claims in this complaint so triable.

Respectfully submitted this 29th day of February 2024.

> _/s/ MaryBeth V. Gibson_
> MaryBeth V. Gibson
> Georgia Bar No. 725843
> **Gibson Consumer Law Group, LLC**
> 4729 Roswell Road, Suite 208
> Atlanta, GA 30342
> (678) 642-2503
> marybeth@gibsonconsumerlawgroup.com
>
> David S. Almeida (_pro hac vice_)
> **ALMEIDA LAW GROUP LLC**
> 849 W. Webster Avenue
> Chicago, Illinois 60614
> david@almeidalawgroup.com
> (t): 312-576-3024

72

Justin E. Proper
Georgia Bar No. 141782
**WHITE AND WILLIAMS LLP**
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA 19103-7395
Phone: 215.864.7165
properj@whiteandwilliams.com

Andrew P. Bleiman (*pro hac vice*)
Mark Fishbein (pro hac vice)
**Marks & Klein, LLP**
1363 Shermer Road, Suite 318
Northbrook, Illinois 60062
T: (312) 206-5162
F: (732) 219-0625
andrew@marksklein.com
mark@marksklein.com

*Attorneys for Plaintiffs Park 80 Hotels, LLC, PL Hotels, LLC, Mayur Patel, JSK Exton LLC, JAY Z. Kuber Hospitality, Inc., Parmattma Corporation, Synergy Hotels, LLC & PH Lodging Tomball, LLC & the Putative Class*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing pleading has been prepared with Times New Roman, 14-point font, in compliance with L.R. 5.1B.

Dated: February 29, 2024                    */s/ MaryBeth V. Gibson*
                                                    MaryBeth V. Gibson


## CERTIFICATE OF SERVICE

I hereby certify that I have this day filed the within and foregoing **PLAINTIFFS' SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** upon all parties to this matter by electronically filing a copy of same with the Court's CM/ECF system, which will automatically send an electronic copy to all counsel of record.

The 29th day of February 2024.

                                                    */s/ MaryBeth V. Gibson*
                                                    MaryBeth V. Gibson